William R. WILHITE,
Plaintiff–Appellee,

v.

BROWNSVILLE CONCRETE COMPANY, INC., Jeff Hayes and Hoyte Hayes, Defendants–Appellants.

Court of Appeals of Tennessee,
Western Section, at Jackson.

July 6, 1990.

Application for Permission to Appeal Denied by Supreme Court Oct. 1, 1990.

John B. Bond, Brownsville, for defendants-appellants.

Harold F. Johnson, Jackson, for plaintiff-appellee.

CRAWFORD, Judge.

This is a suit to recover damages for the allegedly faulty construction of a swimming pool filed by plaintiff, William R. Wilhite, against Brownsville Concrete Company, Inc., Jeff Hayes and Hoyte Hayes. The seventeen page complaint, although unduly verbose with detailed description of facts which are better left to proof, in general alleges that plaintiff accepted a proposal made by defendants to construct a swimming pool for plaintiff in a good, workmanlike manner. Plaintiff avers that the defendants breached the contract, breached the express warranty to perform the contract in a good workmanlike manner, and breached an implied warranty of fitness for its intended use. The complaint seeks damages for costs incurred to correct the faulty construction, for additional expense incurred to maintain the pool because of the faulty construction and for the loss of use of the pool.

The defendants' answer joins issue on the material allegations of the complaint and further avers that the existing damage

to the swimming pool was caused by the intervening act of third parties.

After a full evidentiary hearing without a jury, the trial court found that the swimming pool was not properly constructed and that this caused the pool to float or come out of the ground. The court further found that the necessary cost to repair the damage by replacing the pool was $33,000.00, and plaintiff also incurred additional expense for chemicals during the years 1984, 1985 and 1986 in the amount of $1,950.00. Judgment was entered for plaintiff in the amount of $34,950.00 against the defendants Brownsville Concrete Company, Inc., Jeff Hayes and Hoyte Hayes.

Defendants have appealed and present four issues for review by this Court. At the outset, we should point out that none of the defendants-appellants have presented any issue pertaining to their individual liability to the plaintiff based on their individual relationships, contractual or otherwise, with the plaintiff. Although the trial court found the defendants jointly and severally liable, the defendants have raised no issue concerning this aspect of the case. Therefore, the defendants will be considered as one in our deliberation on the issues.

■ We will now consider the issues as presented by the appellants.

Issue No. 1: Whether it was error for the trial court to find that the swimming pool was defectively built by the Appellants when there was no proof shown to point to a specific defect.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

The trial court relied primarily upon the testimony of Diana Hughes, Randy Brewer and Billy Brewer in making his determination that faulty construction on the part of the defendant caused the damage to plaintiff. We briefly review their testimony:

### DIANA HUGHES

At trial, Diana Hughes, the daughter of the plaintiff, testified concerning the problems with the pool. Because of the age of her parents, Diana Hughes resided in a trailer behind their home and was responsible for the maintenance and up-keep of the pool. She testified that the pool was under construction in the fall of 1983 and that upon completion she swam in the pool in the fall of 1983, even though the water was too cold for swimming. The pool was not covered for the winter until February of 1984, because of the need to have a special covering made for it, but Hughes testified that prior to covering the pool, it had lost approximately two feet of water.

When the pool was uncovered for the 1984 swimming season commencing in May, Hughes testified that she again observed a lowered water level and also observed algae in the pool as well as several places where the coping (the horizontal tiles around the top of the pool) had broken and where the wooden spacers around the deck were protruding. Defendants repaired the coping, the decking, and replastered the rough surface inside the pool. Hughes testified that the defendants had no explanation for the water loss other than evaporation and had no explanation of why the water loss ceased when the water level got below the skimmers. In the summer of 1984, Hayes did find a broken tile within the skimmer and that behind this broken tile there was a two-inch crack. Hughes testified that Hayes replaced the tile and the water loss ceased for two to three months, but then commenced again when the same tile broke loose a second time. Hughes testified that over the 1984 swimming season, the plaintiff spent approximately $1,000 more than normal in pool chemicals as a result of the water loss.

Hughes testified that when the pool was uncovered for the 1985 swimming season, she then observed a lowered water level, broken coping, and also spaces between the decking and the coping. Water loss problems and algae continued through the summer of 1985, and Hughes testified that she

purchased seven to eight hundred dollars worth of pool chemicals that season.

When the pool was uncovered in 1986, the water level was lower than ever. Hughes testified that the family had less swim time in 1986 than they did in 1984 or 1985 because of algae problems and because of the uncomfortably high level of chlorine necessary to kill off the algae.

In early 1987, Mrs. Wilhite (wife of plaintiff and mother of Diana Hughes) was hospitalized. Hughes testified that plaintiff wanted the pool to be in an aesthetically pleasing condition when his wife was released from the hospital because she gained such enjoyment from it. For this reason, he contacted Jeff Hayes who came to the pool site on Friday, April 10, 1987. Hughes testified that Hayes said he would drain the pool and then check the light and the bottom drain. Hughes did not remember seeing Hayes on Saturday, but saw a ladder in the fully drained pool and observed the light hanging out of its socket.

On Sunday, Randy Brewer came to the pool site to acid wash the pool. He put the light back in its socket and, after notifying Hughes, replaced the hydrostatic valve in the bottom of the pool with a plug. At approximately 12:30 p.m., April 12, Hughes and Brewer stretched five garden hoses into the pool and began to refill it. While the water was filling the pool, Hughes observed a crack in the concrete in the side of the pool through which mud was oozing into the pool. In response to this, Hughes turned off the water to the pool. At this time, the water filled the deep end of the pool and was level with the bottom of the shallow end. That night at about 9 o'clock, Hughes heard noises which sounded like firecrackers or shotguns, and in the morning the pool had risen several inches out of the ground. Hughes testified that Jeff Hayes returned Monday afternoon when he learned that the valve had been removed and a plug installed, he said, "It's yours."

Hughes testified that the pool was not repaired that summer and that no one would agree to fix it until the Brewer company finally agreed to rebuild the pool in June of 1988. On cross examination, Hughes testified that the previous owner of the home had a pool float as this one did, but she testified that the pool had been drained and left emptied.

## RANDY BREWER

Randy Brewer testified as to his involvement with this pool and was also allowed to give opinion testimony as an expert in the construction of pools. He testified that hydrostatic valves such as the one installed by Hayes function by opening when water pressure below the pool is greater than that within the pool and that they are not used by many people. He testified that he has had no problem from not using them. There was no water coming in through the hydrostatic valves when he was there cleaning the pool.

Brewer testified that he replaced the valves in the pool with plugs. He testified that after the incident in April he observed large cracks in the pool wall and observed that the water was down about two feet. He opined that the hydrostatic pressure which forced the pool to "float" was caused by leaking water as the pool was being filled.

## BILLY BREWER

Billy Brewer, Randy Brewer's father, testified as to his observations of the Wilhite pool and as an expert, having been in the pool business for 26 years. He testified that in April of 1987 the Wilhite pool had risen approximately four to eight inches out of the ground. He returned to the pool in June or July of 1988 to rebuild the pool. At that time he observed a crack below the skimmer in the deep end of the pool which went from the skimmer almost to the bottom of the pool. Behind this crack he found a void on the west side of the pool which was approximately two to three feet wide and fourteen to eighteen inches deep. Additionally, when he removed the bottom of the pool he found a void of eighteen to twenty inches under the pool's bottom which contained four to five thousand gallons of water. In his opinion the water seeped out of the crack as they filled the pool and, rising through the dirt,

forced mud in through the crack at the void. He testified that the installation of the plug would not matter. There must have been water escaping while the pool was being filled, because if there had been water under the pool before they began to fill it, the hydrostatic pressure of that water would have forced it through the crack while it was empty.

He testified that a water drop of a foot and a half per day would have to be caused by a leak and is a very substantial water loss. He opined that the water was leaking as the pool was being refilled and caused the hydrostatic pressure to force the pool out of the ground. He further opined that the leak resulted from faulty construction.

The defendants introduced virtually no testimony contradicting the testimony of these witnesses. Under these circumstances, we cannot say that the evidence preponderates against the findings of the trial court. This issue is without merit.

■ The second issue presented for review is:

Issue No. 2: Whether the trial court can award damages over and above the contract price when there was no showing that damages above the contract were caused by the Appellants.

The trial court awarded the plaintiff $33,000 which was the amount plaintiff paid Brewers Pool and Landscaping Company to repair the pool. Plaintiff was also awarded $1,950 to compensate for the excess chemicals used while the pool was leaking.

Appellant contends that the trial court erred in making an award in excess of the original contract amount. The original contract was for $16,000. Additionally, the defendants were paid substantial amounts for other work including decking, fencing and a pool house yet the trial court's award of $34,950.00 exceeds the amount which the plaintiffs paid to the defendants for construction of this pool and its accessories.

■ The purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have had if the contract had been performed. *Action Ads Inc. v.*

*William B. Tanner Co. Inc.,* 592 S.W.2d 572, 575 (Tenn.App.1979); see also *Estate of Jessee v. White,* 633 S.W.2d 767 (Tenn. App.1982). If the defects in workmanship are so substantial that the performance of the contract made by the defendant is worthless, the contractor must pay the other party the cost of having the job redone. 22 Am.Jur.2d Damages § 68.

In this case, the plaintiff bargained for and is entitled to a functional swimming pool. Diana Hughes testified that she attempted to get the pool repaired, but was unable to do so. She was finally able to get Billy Brewer to undertake the job but only if the pool was replaced. Brewer testified:

> ... that the only way that I would do any thing to it and guarantee it is to be able to bust the deep bottom of that pool out and run new plumbing around it and cut the top off the pool where it had jacked out of the ground and put a pool inside the pool.

He testified that this was more expensive than building a new pool on a regular plot of ground would have been. No evidence was presented as to a less expensive method of repairing the pool. Because of the condition of plaintiff's property caused by the faulty construction, an award in excess of the contract price is appropriate.

■ The next issue presented for review is:

Issue No. 3. Whether warranties express or implied had expired in the instant case.

The argument in support of this issue consists solely of questions asked by appellant of this Court. Appellants point to no place in the record concerning proceedings involving this issue as required by Rule 6, Rules of the Court of Appeals. Moreover, appellants make no legal arguments and cite no supporting authorities. This issue will not be considered further by the Court.

■ The last issue presented for review is:

Issue No. 4. Whether the intervening act by Randy Brewer in installing a plug in the swimming pool caused any obli-

gation owed by appellants to appellee to end.

As we previously noted, the trial court found that faulty construction caused the damage for which plaintiff sought recovery, and from our review of the record the evidence does not preponderate against such findings.

Accordingly, the evidence does not preponderate against a finding that there was no intervening act which proximately caused the damages. This issue is without merit.

The judgment of the trial court is affirmed and this case is remanded to the trial court for such further proceedings as may be necessary. Costs of the appeal are assessed against the appellants.

TOMLIN, P.J. (W.S.), and HIGHERS, J., concur.