# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

**FILED**

**June 22, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

DOUGLAS J. RADANT and )
BARBARA RADANT, )
           )
      Plaintiffs/Appellees, )    Shelby Circuit No. 80794-5 T.D.
           )
v. )
           )
ROBERT EARWOOD, Individually, )    Appeal No. 02A01-9802-CV-00029
and as EARWOOD CONTRACTORS, )
           )
      Defendant/Appellant. )

APPEAL FROM THE CIRCUIT COURT OF SHELBY COUNTY
AT MEMPHIS, TENNESSEE

THE HONORABLE KAY S. ROBILIO, JUDGE

For the Plaintiffs/Appellees:         For the Defendant/Appellant:

T. Tarry Beasley, II              Harold W. Fonville, II
Memphis, Tennessee            Memphis, Tennessee

**AFFIRMED AS MODIFIED AND REMANDED**

HOLLY KIRBY LILLARD, J.

CONCURS:

W. FRANK CRAWFORD, P.J., W.S.

ALAN E. HIGHERS, J.

OPINION

This is a construction contract case. The plaintiff homeowners assert a breach of contract by the defendant contractor regarding construction of the plaintiffs' home. The trial court entered a $30,000 judgment in favor of the plaintiffs. With some modification, we affirm the trial court's decision and remand for a determination of damages covered by the warranty.

On December 23, 1994, Plaintiffs/Appellees Barbara and Douglas Radant ("Radants") contracted with Defendant/Appellant Robert Earwood d/b/a Earwood Contractors ("Earwood") to construct a new home in the Halle Plantation Subdivision in Collierville, Tennessee. Earwood constructed the house, and the Radants closed on the purchase on August 18, 1995. The Radants paid approximately $290,000 for the home. At the closing and on several subsequent occasions, the Radants furnished Earwood with a list of items which were incomplete or inadequate. In addition, Earwood furnished the Radants with a One Year New Home Limited Warranty ("Warranty"). The construction contract provided as follows:

ARTICLE X
BUILDER'S WARRANTY

CONTRACTOR SHALL SUPPLY A ONE (1) YEAR NEW HOME LIMITED WARRANTY AS ISSUED BY THE NATIONAL ASSOCIATION OF HOMEBUILDERS AND THE HOME BUILDERS ASSOCIATION OF MEMPHIS. HOWEVER, ANY ADDITIONAL WARRANTY DESIRED BY THE OWNERS SHALL BE PAID FOR BY THE OWNERS.

The Warranty included certain limitations:

PURCHASER AGREES THAT THIS REGISTERED BUILDER WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, STATUTORY OR OTHERWISE, EXPRESSED OR IMPLIED, ALL OTHER REPRESENTATIONS MADE BY BUILDER AND ALL OTHER OBLIGATIONS OR LIABILITIES WITH RESPECT TO SAID PROPERTY. IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS ARE SPECIFICALLY EXCLUDED, AND THE BUILDER'S OBLIGATION SHALL NOT EXCEED ITS OBLIGATION SET FORTH IN SAID REGISTERED BUILDER WARRANTY.

The Warranty lists possible deficiencies or problems in construction. For each possible deficiency, the Warranty lists a performance standard explaining acceptable construction standards and describes whether it is the responsibility of the builder or the homeowner to remedy the deficiency. For example, for the deficiency of pitting, scaling or spalling of concrete, it is the builder's responsibility to repair concrete surfaces should they disintegrate so that the aggregate is exposed.

On October 1, 1995, the Radants furnished Earwood with a list of items in the home that needed to be remedied. The list included drainage problems in the backyard and the need for a drain in the backyard. Earwood acknowledged that water was ponding in the backyard, and that the

problem was covered by the Warranty. In a letter to the Radants dated October 17, 1995, Earwood said:

> The condition of the yard is as much an embarrassment to me as it is to you. As you know, I have hired a local Civil Engineering firm to come up with a drainage plan to eliminate any further problems. I have done this at my own expense and have gone on record as saying that I fully intend to make this situation RIGHT! While I will apologize for this taking longer to accomplish than either of us would like, I stand behind my decision to handle it in this fashion as opposed to just "dumping dirt" on it as you originally suggested.

In order to remedy the drainage problem, Earwood installed a French drain system that emptied into underground tanks. However, even after installation of the French drain, the yard continued to have substantial drainage problems.

In May, 1996, the Radants furnished Earwood with another list of items that needed to be remedied. The list included:

> 22. BACK YARD DOES NOT DRAIN PROPERLY; WATER STAYS IN BACK YARD DAYS AND SOMETIMES WEEKS AFTER A RAIN SHOWER. BACK YARD HAS BEEN UNUSABLE SINCE MOVE IN ON AUGUST 18. 1995 [sic].

In a letter to the Radants dated June 15, 1996, Earwood stated:

> I would like to sum up the situation as I see it.
>
> > a) the water that is still ponding in the backyard is coming from all four of your surrounding neighbors on a daily basis as they water their lawns.
> > b) the daily rains that you mentioned in your letter were excessive and, under normal circumstances, would be handled by the subsurface drainage system that I installed.
> > c) the surface water drainage system of this portion of the subdivision was poorly designed in that there should have been a drain inlet in the back corner of your lot at the intersection of three lots. This would have allowed us to grade the backyard from the house to that drain. What we were forced to do was to grade from a point at the back of the yard all the way to the front. A distance of some 209 feet.
> > d) the water coming from your neighbors is made worse from the fact that they have piled soil and mulch up to 6" or 8" along the fence.
> > e) the grade can be raised in those areas where water is ponding. I explained to you after we left there on May 26th that once all of the newly filled areas have settled, that we would be back to make the needed adjustments.
>
> Doug, to put this in simple terms, I have done all that I feel is under my responsibility to make corrections with the work on your yard. This, of course, is in exception to the work mentioned above in item (e). . . .
>
> ****
>
> As for your wish for me to remove the tanks and drains that I installed, I will have to refuse that request due primarily to the fact that you were made 100% aware of the process and procedure that I was taking to correct the drainage problem. It was designed to handle the water generated by normal rainfall and in our discussions, I

2

explained that water generated by rainfall may stand in certain areas on an average of 24 hours and no longer than 48 hours. Based on the Homebuilder's Warranty issued to you at closing, this is my limit of responsibility.

In closing, I would like to say that I have been committed from Day One to fulfilling my responsibility as your builder, but it is now out of my hands. In my opinion, the burden of providing proper drainage at the property lines and beyond rests with the developer. . . .

The Radants submitted the matter to independent inspection by the Home Builders Association of Memphis - Registered Builder Committee. The committee issued an inspection report on September 10, 1996, which included the following:

The Registered Builder Committee of the Home Builders Association of Memphis determined that your builder should correct the following items in your home which were determined not to be in compliance with industry standards as outlined [in] the New Home Limited Warranty. . . .

Problem: Proper site drainage never established

Standard: The necessary grades and swales shall have been established by the Builder to insure proper drainage away from the Home. Standing or ponding water shall not remain for extended periods in the immediate area after a rain (generally no more than 24 hours), except that in swales which drain other areas, or in arears [sic] where sump pumps discharge, a longer period can be anticipated (generally no more than 48 hours). The possibility of standing water after an unusually heavy rainfall should be anticipated. . . .

****

Problem: Crack between garage door & wall

Standard: Exterior doors will warp to some degree due to temperature differential on inside and outside surfaces. However, they shall not warp to the extent that they become inoperable or cease to be weather resistant or exceed National Woodwork Manufacturers Association Standards. . . .

****

Problem: Playroom windows not sealing properly

Standard: Builder will adjust or correct poorly fitted doors, windows and poorly fitted weatherstripping.

****

Problem: Tile cracked in bathroom

Standard: Ceramic tile shall not crack or become loose and builder will replace cracked tiles and resecure loose tiles.

****

Problem: Cracks above garage door

Standard: Cracks greater than 3/8 inch in width are considered excessive. Builder will repair cracks in excess by pointing or patching.

3

****

Problem: Garage door does not meet top of beam above garage door, "bowed down"

Standard: This is not specifically addressed in the warranty, however the inspectors suggest that this be corrected to keep from bowing or further sagging.

On August 19, 1996, prior to issuance of the inspection report, the Radants filed suit in the Shelby County Circuit Court against Earwood, alleging certain defects in the construction of the home. The Radants attached as an exhibit to the complaint a punch list dated May 20, 1996 purportedly listing uncorrected problems with the home. The following defects were alleged: cracked tile; misaligned windows; cracked walls, ceilings, exterior bricks, garage, and driveway; peeling ceilings; loose electrical outlets and lighting fixtures; loose floor boards; water leakage inside the house; gaps between kitchen cabinets; separation of wood trim from walls; improper installation of dishwasher; failure to install soffitt grills and certain insulation; scratches on windows; improperly functioning sink drain; stain spots on front door; improper wood grate above front door; dead grass in front yard; and water drainage problems in back yard. The Radants sought $100,000 in damages for breach of the construction contract.

Earwood denied that there were significant defects in the home. He asserted that he had corrected any problems for which he was responsible. He disputed whether many of the defects reported by the Radants were really "defects," and disputed his obligation to fix many of the alleged defects. Earwood denied that any of the alleged problems would cause future damage or require future repairs. He raised several defenses, including failure to state a claim, that many of the problems were not covered in the Warranty, that the Radants failed to comply with the Warranty and failed to give notice of the defects within a reasonable time, that neighboring land owners and the developer of the subdivision were negligent, and waiver.

During the two day bench trial, the trial court heard testimony and received evidence regarding a number of issues, including the diminution in value of the house and the estimated cost of repair. The Radants submitted the expert testimony of Earl Randall Bouldin, Jr., a certified general real estate appraiser. Bouldin testified that the value of the property as of July 1, 1997 was $270,000, but that the property would have been worth $305,000 if it were properly repaired. Douglas Radant testified that the property was worth $245,000 in its condition at the time of trial, and that it would have been worth $305,000 if repaired. He testified that he and his wife had spent

4

approximately $3000 on contractors, landscapers, and other experts to analyze how they could correct the problems. Barbara Radant placed a value of $250,000 on the defective home and a value of $300,000 value on the repaired home.

The Radants also offered the expert testimony of Robert Martin Pollan, a local general contractor. Pollan testified that the cost of repair for all necessary repairs would be $37,240. This estimate was comprised of the following components: $16,496 to excavate and remove the old drainage system, re-grade and sod the yard; $6,986 to remove and to replace the brick veneer on the garage wall and on a section on the back side of the house; $2,872 to replace the spalled concrete; $1,825 to repair damaged drywall in the master bath, game room and upstairs bedroom; $8,734 for miscellaneous carpentry work including adjustments to windows, replacement of the back door, stretching and relaying of the carpet, replacement of defective windows, splicing and bracing a rafter in the attic and cutting an opening in the gable for ventilation; and $327 for removal of trash and debris.

Bryan H. Stephens, Jr., a civil engineer, also testified for the Radants. He found several problems with the property, including improper drainage around the property, a sag in the beam over the garage opening, an improper roof slope, and poor framing and ventilation in the attic. He stated that the poor water drainage, if left uncorrected, would eventually lead to foundation settlement and moisture inside the house, causing mildew and rot in the studs.

The Radants also offered the expert testimony of Michael Lee Hatcher, a Certified Landscape Professional. Hatcher testified that the drainage tanks installed in the back yard in connection with the French drainage system would need to be removed since the water could not percolate out of them as fast as they were filled, and thus the water had no place to go. He testified that the yard needed a combination of surface and subsurface drainage.

Earwood submitted the expert testimony of John Wesley Ashworth, III, a civil engineer, who found "a couple of sunken areas about eight feet wide or so that did not have grass growing in them." He considered the French drainage system to be adequate to drain the back yard. He recommended that the low spots around the tanks be filled in and resodded, and that a sump pump possibly be installed to drain water to the curb. He saw no reason to remove the tanks. He concluded that the drainage problem was the result of the subdivision developer failing to install a drain when the subdivision was designed. He found no damage to the foundation. To correct the cracked pilaster

5

beside the back door, he recommended caulking since there was no structural defect in the pilaster. Although he noted the sagging garage door beam, he did not consider it structurally unsound.

Earwood testified that the French drain system was properly installed. He also thought the installation of a sump pump would probably be necessary to drain excess water from the tanks. He indicated that he had not fixed the brick pilaster by the back door or the cracks in the brick above the garage because the Warranty provides that cracks less than three-eighths of an inch can be caulked. He testified that the sod in the front yard was alive when he put it in, and that replacement of sod is not included in the Warranty. He conceded that the items listed in the inspection report by the Home Builders Association of Memphis had not been corrected. Earwood stipulated that several problems were covered by the Warranty, namely, the cracked and crumbling driveway, the missing soffit vent, and cracks in the ceiling of the playroom. Earwood agreed he was responsible for correcting these problems.

On September 12, 1997, the trial court entered a judgment in favor of the Radants for $30,000. The trial court found that the yard "was not completed properly to drain the back and side yards" and listed numerous defects in construction. It noted that the Radants submitted testimony on the devaluation of the home and the cost of repair and that no testimony was submitted by Earwood to counter the testimony of the Radants and their expert witnesses. The trial court's "Order of Judgment" provided in relevant part:

> The devaluation and loss to the Plaintiffs in the value of their home was established by the testimony of the expert appraiser, the evaluation by the homeowners and adjusted according to cost of repair as testified to by the contractor and civil engineer to $30,000 for which judgment will be granted.

In addition to the improperly completed back yard, the trial court based its award on several construction defects that were not in accordance with the building standards in the community: "a roof problem, sagging garage header, spaulding [sic], and deteriorated concrete, misaligned door and windows, and several leaks about the home, including numerous windows and the chimney, a misfitting window grid, a ceiling problem where the air conditioner drain had been installed improperly with a broken drain pipe, closed in eaves without proper ventilation and a soffet [sic] vent that is missing." From this order, Earwood now appeals.

Our review of the findings of fact by the trial court is *de novo* upon the record of the trial court, accompanied by a presumption of correctness of the factual findings unless the preponderance

6

of the evidence is otherwise. Tenn. R. Civ. P. 13(d). Questions of law are *de novo* with no presumption of correctness. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995).

On appeal, Earwood asserts that the trial court erred in not applying the proper measure of damages and in disregarding the limitations of liability contained in the Warranty. He argues that the measure of damages would be either the cost of repairs or the depreciation in the value of the house caused by the defects and that the trial court's award of damages was neither. He maintains that the Radants failed to prove the depreciation in the value of the house because they were required to prove the difference in value immediately before and after "the injury"; the Radants instead submitted proof pertaining to the value of the house at the time of trial. Earwood contends that the trial court should have utilized the cost of repair as the measure of damages, minus items which are specifically excluded in the Warranty and recognizing the Warranty's disclaimer of implied warranties of merchantability and fitness and other items.

The Radants maintain that the trial court utilized the correct measure of damages but committed error in its calculation of damages. The Radants argue that the limitations in the Warranty are not controlling because Earwood gave the Radants further assurances, verbally and in writing. They request that the trial court's award be modified to at least $37,240 up to a maximum of $60,000.

It is unclear from the trial court's order how the trial court arrived at the $30,000 figure. The trial court referred to the uncontroverted testimony on the devaluation of the home, then referred to this amount as "adjusted according to cost of repair." No reference was made to the Warranty or whether certain items were excluded pursuant to the Warranty.

In assessing damages in a breach of contract suit, the goal is to place the plaintiff, as nearly as possible, in the same position he would have been had the contract been performed. *See Wilhite v. Brownsville Concrete Co.*, 798 S.W.2d 772, 775 (Tenn. App. 1990); *Action Ads, Inc. v. William B. Tanner Co.*, 592 S.W.2d 572, 575 (Tenn. App. 1979). Both parties rely upon *Edenfield v. Woodlawn Manor, Inc.*, 462 S.W.2d 237 (Tenn. App. 1970), as authority for the measure of damages to be assessed in construction contract cases. *Edenfield* states:

> "As a general rule, the measure of damages is the cost of correcting the defects or completing the omissions, rather than the difference in value between what ought to have been done in the performance of the contract and what has been done, where the correction or completion would not involve unreasonable destruction of the work done by the contractor and the cost thereof would not be grossly disproportionate to

the results to be obtained. On the other hand, the courts generally adhere to the view that if a builder or contractor has not fully performed the terms of the construction agreement, but to repair the defects or omissions would require a substantial tearing down and rebuilding of the structure, the measure of damages is the difference in value between the work if it had been performed in accordance with the contract and that which was actually done, or (as it is sometimes said) the difference between the value of the defective structure and that of the structure if properly completed. Despite this latter rule, however, there is some authority to the effect that damages for a contractor's breach of contract to construct a dwelling, where it is not constructed in accordance with the plans and specifications, *are* the amount required to reconstruct it to make it conform to such plans and specifications, rather than the difference in loan or market value on the finished dwelling, since unlike a commercial structure, a dwelling has an esthetic value and must be constructed as the owner wants it, even though the finished dwelling may be just as good."

*Id.* at 241 (quoting 13 Am. Jur. 2d § 79); *see also Birdwell v. McKinney*, No. 01A01-9701-CV-00023, 1997 WL 773730, at *10 (Tenn. App. Dec. 17, 1997); *Oakwood Furniture Mfg., Inc. v. Ruh & Pressley Constr. Co.*, No. 03A01-9307-CH-00233, 1993 WL 477020, at **4 (Tenn. App. Nov. 15, 1993); *Nutzell v. Godwin*, 1989 WL 76306, at **1 (Tenn. App. July 13, 1989). In *Fuller v. Orkin Exterminating Co.*, 545 S.W.2d 103, 108 (Tenn. App. 1975), this Court stated:

> [T]he measure of damages for injury to real estate is the difference between the reasonable market value of the premises immediately prior to and immediately after injury but if the reasonable cost of repairing the injury is less than the depreciation in value, the cost of repair is the lawful measure of damages. Of course, the trier of fact can also take into consideration the reasonable cost of restoring the property to its former condition in arriving at the difference in value immediately before and after the injury to the premises.

*Id.* at 108 (citation omitted).

*Redbud Cooperative Corp. v. Clayton*, 700 S.W.2d 551 (Tenn. App. 1985), involved a fact situation analogous to the case at bar, in that it involved flooding and attendant drainage problems in a residential development. In *Redbud*, the Court held:

> Based upon the proof in this record, we conclude that the only reasonable basis upon which the trial court could have awarded damages was the cost of repairing Redbud's inadequate drainage system.
>
> ****
>
> We thus, conclude that the trial court was justified in awarding damages based upon the estimated cost of repairing the development's drainage system. This evidence can be taken into consideration in attempting to determine the difference in the property's value . . . and in this case it was the only reliable evidence before the trial court.

*Id.* at 561 (footnotes and citations omitted).

As noted above, from the trial court's order, it is unclear whether the trial court utilized the diminution in value or the cost of repair as the measure of damages. Generally, the measure of

damages will be the cost of repair unless the repairs are not feasible or the cost is disproportionate to the diminution in value. *Nutzell*, 1989 WL 76306, at **1 (citing *Estate of Jessee v. White*, 633 S.W.2d 767, 769 (Tenn. App. 1982); *Redbud*, 700 S.W.2d at 560. In this case, testimony submitted by the Radants was uncontroverted that the diminution in value was between $35,000 and $60,000. The undisputed testimony submitted by the plaintiff indicated that the cost of repair for all items claimed by the Radants was $37,240. The defendant presented no proof in this case that the cost of repair was unreasonable as compared to the diminution in value. *See Nutzell*, 1989 WL 76306, at **1; *see also Oakwood*, 1993 WL 477020, at **5. Under these circumstances, the appropriate measure of damages is the cost of repair.

We next consider the effect of the Warranty. The Radants do not dispute that the Warranty was part of the agreement between the parties; rather, they argue that the Warranty was not effective until the construction had been completed in a workmanlike manner or met community standards. They contend that many of the items Earwood argues are not covered by the Warranty were not constructed properly. Since the defects were present before the Warranty became effective, the Radants argue that the Warranty cannot serve as a bar to their recovery. Earwood responds that the language of the Warranty plainly states that "[t]he commencement date of this warranty is the date of property transfer or the date of first occupancy, whichever occurs first." The language of the Warranty plainly states the effective date of the Warranty. We do not find the Warranty unenforceable on this basis.

The Radants also argue that Earwood gave assurances, verbally and in writing, beyond those provided in the Warranty, and that therefore Earwood should not be permitted to assert as a defense the limitations contained in the Warranty. Earwood does not deny making several assurances; however, he contends that all the assurances concerned the backyard drainage problem covered by the Warranty, and therefore did not extend any coverage provided by the Warranty.

In *Dixon v. Mountain City Construction Co.*, 632 S.W.2d 538 (Tenn. 1982), our Supreme Court adopted the doctrine of the implied warranty of good workmanship and materials as applied to newly built dwellings. The Supreme Court noted that:

> This warranty is implied only when the written contract is silent. Builder-vendors and purchasers are free to contract in writing for a warranty upon different terms and conditions or to expressly disclaim any warranty.

9

*Id.* at 542.  Subsequently, this Court stated in *Dewberry v. Maddox*, 755 S.W.2d 50, 55 (Tenn. App. 1988):

> [W]e think that in order to have a valid disclaimer of the implied warranty, it must be in clear and unambiguous language.  The buyer must be given "adequate notice of the implied warranty protections that he is waiving by signing the contract."

*Id.* at 55 (quoting *Tyus v. Resta*, 476 A.2d 427, 432 (1984)); *see also Axline v. Kutner*, 863 S.W.2d 421, 424 (Tenn. App. 1993).

The Warranty in this case specifically excludes the implied warranties of merchantability and fitness.  The Warranty also limits the implied warranties of workmanship and materials to certain enumerated deficiencies arising within the first year after completion of the home.

This Court has held that language in a warranty similar to that contained in the Warranty in this case is sufficient to disclaim all other warranties, including the implied warranty of good workmanship and materials as set forth in *Dixon*.  *See Henry v. Nova, Inc.*, No. 03A01-9804-CH-00121, 1998 Tenn. App. LEXIS 593 (Aug. 17, 1998) (interpreting the language: "This warranty is in lieu of any and all other warranties, whether express or implied warranties of habitabitability or merchantability"); *Bunch v. Cooper*, No. 03A01-9705-CV-00154, 1997 Tenn. App. LEXIS 652 (Sept. 30, 1997) (interpreting the language: "This warranty is in lieu of all other warranties, express or implied, including but not limited to, implied warranties of merchantability, habitability, and fitness for a particular purpose").  In this case, the language in the Warranty clearly limits it to the express warranties and disclaims implied warranties.  Under Tennessee case law, this is enforceable.

At trial, the Radants provided several statements by Earwood that purportedly modified the express Warranty.  The Radants point to a letter by Earwood dated August 20, 1995 stating that it was his "sincere goal to give [the Radants] a 'ZERO DEFECTS' home."  The Radants also provided a letter from Earwood dated September 23, 1995.  In this letter Earwood promised that the back yard drainage problem would be fixed and discussed a repair to the vinyl flooring in the sunroom bath.  In a third letter dated Oct. 17, 1995, Earwood listed seven items that needed to be completed by him: installation of grids above the front door, installation of a gas starter in a fireplace, installation of insulation in an upstairs closet, pouring an additional area of concrete for the driveway, touching up the paint around the skylight, and remedying the drainage problem in the back yard.

On appeal, the Radants argued that the estimate by their expert, Robert Pollan, covered all the repairs still needed on the property.  A comparison of the deficiencies listed in Pollan's estimate

10

with the items listed in Earwood's letters shows that the Radants seek recovery for only three items that were also listed in Earwood's letters: the grid above the front door, the pouring of additional concrete on the driveway, and the backyard drainage problem. Earwood conceded responsibility for the drainage problem in the back yard, as it was covered by the Warranty. On appeal, Earwood does not dispute his obligations to install the proper grid above the front door or the pouring of additional concrete. Earwood disputes only the Radants' right to recover for the roof problems, the sagging garage header, and the problems caused by the air conditioner pipe that were awarded in the damages award. He argues that these items were within the performance standards of the Warranty and that, as a result, the Radants cannot recover for these items. There is no dispute over the items listed in his letters. Indeed, these items are not inconsistent with the Warranty. Therefore, the assurances contained in Earwood's letters, concerning items whose coverage under the Warranty is not disputed, cannot be construed to negate the limitations of the Warranty. Earwood may assert as a defense the limitations contained in the Warranty.

From the record in this cause, this Court cannot determine with certainty the amount of the damages for the items that are covered by the Warranty and the amount attributable to items that are excluded. The cause must be remanded for the trial court to determine these amounts.

Finally, the Radants assert that Earwood did not provide certain items under the terms of the contract, including a security system and a bath window. The Radants also assert that Earwood is responsible for a $600 overage for carpet which was installed. They assert that they should not have been charged extra for the brick quoins on the house since their house plans were based on a house that had brick quoins. In response, Earwood maintains that the $500 line item in the construction contract for a security system covered only pre-wiring, to which the Radants agreed, and which was done. Earwood contends that the Radants have failed to prove any damages as a result of the allegedly omitted window, and that they have failed to establish that they did not receive the carpet for which they contracted. He asserts that the owners of the house on which the Radants house plans were based had paid extra to receive quoins, and thus the price of the quoins was not included in the base price of the house. It appears that these items were not included in the trial court's award of damages. After reviewing the record, the evidence does not preponderate against the trial court's decision not to award damages on these items. This decision is affirmed.

11

In sum, the appropriate measure of damages in this case is the cost of repair. We do not find that the statements in Earwood's letters to the Radants prevent Earwood from asserting as a defense the limitations of the Warranty. The case is remanded to the trial court for a determination of which items included in the damages award are recoverable under the Warranty. A preponderance of the evidence supports the trial court's exclusion from the damages award of several errors and omissions.

The decision of the trial court is affirmed as modified and remanded for further proceedings consistent with this Opinion. Costs are taxed to Appellant, for which execution may issue if necessary.


_____
HOLLY KIRBY LILLARD, J.

_____
CONCUR:


_____
W. FRANK CRAWFORD, P. J., W.S.


_____
ALAN E. HIGHERS, J.

12