IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 14, 2004 Session

# RON COLQUETTE v. PETER ZALOUM

**Appeal from the Chancery Court for Knox County**
**No. 151029-2     Daryl R. Fansler, Chancellor**

_____

**No. E2003-2301-COA-R3-CV - FILED AUGUST 30, 2004**

_____

Ron Colquette ("Plaintiff") sued Peter Zaloum ("Defendant") claiming, in part, that Defendant made fraudulent misrepresentations in connection with the sale of his business and the lease of his land to Plaintiff, and that Defendant violated the Tennessee Consumer Protection Act.  After a bench trial, the Trial Court entered a Final Judgment holding, *inter alia*, that Plaintiff was entitled to damages in the amount of $70,054.35, plus pre-judgment interest; that Plaintiff was entitled to punitive damages in the amount of $15,000; and that the Tennessee Consumer Protection Act was not applicable to this case.  Defendant appeals, and Plaintiff raises additional issues concerning the applicability of the Tennessee Consumer Protection Act to the facts of this case, and the amount of punitive damages awarded to him.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and WILLIAM H. INMAN, SR. J., joined.

Peter Zaloum, Knoxville, Tennessee, *pro se* Appellant.

Keith McCord and John L. McCord, Knoxville, Tennessee, for the Appellee, Ron Colquette.

# OPINION

## Background

Plaintiff and Defendant signed a document in February of 2000, entitled Business Management Lease and Option to Purchase ("the Contract") regarding an "auto salvage yard located at 7838 Clinton Hwy Powell," Tennessee ("Car World")." The Contract provided that Plaintiff was to begin leasing and operating Car World on March 1, 2000, with an option to purchase the "property including all equipment" in 2002. The contract also provided that Plaintiff would purchase "all inventory inside of building and approximately 450 junked cars for the amount of $50,000.00 prior to closing."

Plaintiff, who knew nothing about the junk car or salvage yard business prior to signing the Contract, claims that Defendant made representations regarding Car World that were untrue. Plaintiff claims that Defendant told him "the average sales were approximately $9,000 in the bad months and $12,000 in the good months . . . ." Plaintiff used Defendant's figures to calculate that the average sales for a year would be approximately $130,000. Plaintiff also alleges that Defendant told him "he paid for his houses and sending his kids to college and going on vacations and gambling and stuff like that" from working the business. Defendant told Plaintiff he owned a $250,000 house with no mortgage. Plaintiff also claims that Defendant promised to help out once Plaintiff took over Car World by labeling assorted parts stored in the building and organizing the titles to the junk cars. Plaintiff claims that Defendant stated he had a good reputation in the area and that the inventory was worth $250,000. Most importantly, Plaintiff claims that Defendant represented that Plaintiff could operate Car World under Defendant's salvage yard license.

Plaintiff alleged that after he took over Car World, he discovered that things were not as Defendant had represented. Plaintiff's total sales for the five-month period he operated Car World came to $24,000. This averages out to approximately $5,000, in sales per month, an amount far short of the $9,000, to $12,000, that Defendant represented. In addition, Plaintiff stated that during the time he ran Car World, he incurred net operating losses of $76,000, not including interest on the loans used to acquire the Car World inventory. Plaintiff claimed the inventory was not in as good a shape as represented by Defendant. Plaintiff stated "[w]e had to buy cars all the time because what was there wasn't as good as it was supposedly represented to be. A lot of it was just pretty much junk. It was too old. . . ." Plaintiff also stated that "a lot of the stuff that was there we sold and people brought it back because it was no good." Also, Plaintiff alleged that Defendant did not label the parts or organize the titles as promised.

Plaintiff operated Car World for several months and then, after some discussions, the parties hired attorneys and an agreement was reached for Defendant to take back Car World. However, Defendant refused to return the $50,000 that Plaintiff had paid for the inventory. Plaintiff sued Defendant claiming, in part, that Defendant made fraudulent misrepresentations in connection with the sale of his business and the lease of his land and that Defendant violated the Tennessee

Consumer Protection Act. Defendant filed a counter-claim alleging, in part, that Plaintiff had failed to comply with the material terms of the Contract. The case was tried without a jury.

Defendants's testimony at trial was long, often contradictory, and at times evasive. Both opposing counsel and Defendant's own attorney had a difficult time getting Defendant to answer questions. At times, Defendant claimed he never intended to sell Car World to Plaintiff. At other times, Defendant claimed that the Contract had an option to allow Plaintiff to purchase the business. Defendant admitted that he knew he could not give Plaintiff his salvage license because Plaintiff had not purchased the business, but insisted that Plaintiff could have used the license to operate Car World. However, Defendant later admitted that he knew he was the only person who could use the salvage license to operate a junk yard on his property until the business was sold and the license was properly transferred.

At trial, Defendant's tax returns were introduced for the two years prior to the execution of the Contract, i.e., 1998 and 1999. The tax returns showed that Defendant declared gross sales for Car World of $28,966 for the year 1998, and a profit for that year of $8,616. Defendant's 1999, return shows total gross sales for Car World of $16,646, with a profit of $1,552.

After trial, the Trial Court entered a Final Judgment on August 26, 2003, holding, *inter alia*, that Plaintiff was entitled to damages in the amount of $70,054.35, plus pre-judgment interest; that Plaintiff was entitled to punitive damages in the amount of $15,000; and that Plaintiff's Tennessee Consumer Protection claim was denied. In its Memorandum Opinion incorporated into the Final Judgment, the Trial Court stated:

> Basically, Mr. Colquette, the plaintiff, stated that Mr. Zaloum made certain representations about the performance of the business and the past performance of the business at the time of this transaction.
>
> Mr. Zaloum's account of that conversation is significantly different. Mr. Zaloum said that he never made any specific references. He just said that he had made a good living, and that he put his children through school and had bought a house and so forth. At the trial Mr. Zaloum said that all of that was true, although this [sic] tax returns showed that this business had made little if anything in the two or three years preceding the transaction. . . .
>
> * * *
>
> Let me just note at this point in time the Court finds Mr. Zaloum, the defendant in this case, is not a credible witness. Most of his answers during the course of his testimony have been evasive and at times outright contradictory. The theories advanced by his original counsel were total [sic] refuted by the defendant himself during the course of his testimony on the first day of trial. His credibility has

been totally impeached to a point that this Court simply cannot believe most of his testimony.

The Court finds that Mr. Zaloum did intend to sell the business known as Car World and concocted a scheme that would allow him to retain the salvage and dismantler's license which was required by Mr. Colquette to operate the business. …

\* \* \*

The Court finds that Mr. Zaloum made false representations regarding the use of the license, the sales volume of the business, the actual earnings of the business, as well as the value of the inventory that existed at the time of the transaction.

\* \* \*

Although the inventory was not the same in August as it was in March, the Court finds the value of the inventory on hand in August when Mr. Zaloum resumed control was equal to or greater in value than when the plaintiff took it over in March and paid 50 thousand dollars for it.

\* \* \*

Thus [Defendant] has Mr. Colquette's 50 thousand dollars and an inventory equal to or greater in value than that which Mr. Colquette took over on March 1st of 2000. Thus he benefitted from the plaintiff's cash payment as well as received an inventory which in all likelihood is more amendable [sic] to the operation of a salvage yard than the one he had when Mr. Colquette entered into this agreement and also received rental payments during the period plaintiff held the business.

\* \* \*

The plaintiff has also sought punitive damages in this case. . . .

\* \* \*

Throughout this trial the defendant has steadfastly refused to acknowledge any wrongdoing on his part. He has come up with stories to try to explain his conduct and his statements to the plaintiff in the case. . . . The Court finds that Mr. Zaloum has shown an utter disregard for the licensing laws of this state and concocted a scheme that defrauded the plaintiff and made it at the very least illegal for the plaintiff to operate his business. His misrepresentations have been punitive to a point that he has uttered falsehoods from this stand during the course of his

testimony in an effort to further his scheme. He has never acknowledge [sic] that his statements were wrong or that he has done any wrongdoing in this case whatsoever.

The Court finds it is an appropriate case for punitive damages and awards 15 thousand dollars in punitive damages to the plaintiff. . . .

Defendant appeals to this Court.

## Discussion

Although not stated exactly as such, Defendant raises two issues on appeal: 1) whether the Trial Court erred by failing to try the case fairly; and 2) whether the Trial Court acted in a discriminatory manner toward Defendant by rendering an opinion regarding Defendant's credibility. Plaintiff raises five additional issues, which we restate as: 1) whether the Trial Court erred in holding that the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et. seq.*, was not applicable in this case; 2) whether the Trial Court erred in dismissing Plaintiff's cause of action under the Tennessee Consumer Protection Act; 3) whether the Trial Court erred in refusing to award Plaintiff double or treble damages under the Tennessee Consumer Protection Act; 4) whether the Trial Court erred in refusing to award Plaintiff attorney's fees under the Tennessee Consumer Protection Act; and, 5) whether the Trial Court's award of punitive damages in the amount of $15,000 was inadequate and insufficient.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We note that Defendant is correct that the Trial Court found him to be "not a credible witness." "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999) (quoting *Collins v. Howmet Corp.*, 970 S.W.2d 941, 943 (Tenn.1998)).

We first will address Defendant's issues. Defendant has failed totally to comply with the Tennessee Rules of Appellate Procedure in preparing his appellate brief. Defendant's brief does not contain a table of authorities, a statement of the case, a statement of facts, or an argument with citations to legal authority and appropriate references to the record as required by Tennessee Rule of Appellate Procedure 27(a). Instead, Defendant's brief contains merely a statement of his issues and quotations from the trial transcript along with Defendant's personal comments regarding the material quoted. Because Defendant has failed to comply with the crucial requirements of the Tennessee Rules of Appellate Procedure, Defendant has waived consideration of his issues. *See, e.g., Rampy v. ICI Acrylics, Inc.*, 898 S.W.2d 196, 210 (Tenn. Ct. App. 1994); *Wilhite v. Brownsville*

*Concrete Co., Inc.*, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990). However, we believe it appropriate to note that we found nothing in our review of the entire record in this matter to support Defendant's claim that the Trial Court failed to try the case fairly or that the Trial Court acted in any discriminatory manner toward Defendant. In making its determination regarding Defendant's credibility, the Trial Court properly performed its role as the trier of fact.

We next turn to Plaintiff's issue regarding whether the Trial Court erred in holding that the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et. seq.*, was not applicable in this case. In *White v. Eastland*, this Court stated: "The Tennessee Consumer Protection Act does not apply to isolated, casual transactions between individuals not engaged in the conduct of a trade or business." *White v. Eastland*, No. 01-A-01-9009-CV-00329, 1991 Tenn. App. LEXIS 624, at \*5 (Tenn. Ct. App. Aug. 9, 1991), *no appl. perm. appeal filed*. *See also Ganzevoort v. Russell*, 949 S.W.2d 293, 298 (Tenn. 1997) (stating: "Although this language does not explicitly exclude from the Act sellers not in the business of selling property as owners or brokers, a reasonable construction is that they are not included." (footnote omitted)); *Murvin v. Cofer*, 968 S.W.2d 304, 309 (Tenn. Ct. App. 1997) (stating: "As we read *Ganzevoort*, the criteria for applying the Act is not the extent of a seller's knowledge . . . but whether or not the seller is engaged in the *business* of selling houses." (emphasis in original)).

The *White* Court analyzed the issue stating:

> If Tenn. Code Ann. § 47-18-109(a)(1) were considered without reference to the remaining sections of the Tennessee Consumer Protection Act, it would provide some support for extending the Act's coverage to casual, non-commercial transactions between individuals. However, Tenn. Code Ann. § 47-18-109(a)(1) should not be construed in a vacuum.
>
> \* \* \*
>
> Notwithstanding the Tennessee Consumer Protection Act's broad language, the extent of its application should be tempered by Tenn. Code Ann. § 47-18-102(4) which states that the Act's purpose is to promote ethical dealings "between persons engaged in business and the consuming public." This provision indicates that the General Assembly intended for the Act to apply to transactions between businesses and consumers and not to casual, non-commercial transactions between two individuals.

*Id*. at \*7-9.

As Defendant in this case was not engaged in the business of selling automobile dismantling businesses, the Trial Court correctly held that the Tennessee Consumer Protection Act is not applicable to this case. While Defendant was in the automobile dismantling business, he was not in the business of selling automobile dismantling businesses. Our resolution of this issue

pretermits the necessity of considering Plaintiff's second, third, and fourth issues because there could be no possible error as claimed by Plaintiff in these issues if we hold, as we have, in Defendant's favor as to Plaintiff's issue one.

We next consider whether the Trial Court's award of punitive damages in the amount of $15,000 was inadequate and insufficient. "It is established law that an award of punitive damages lies within the discretion of the trier of facts." *E.g., Whittington v. Grand Valley Lakes, Inc.*, 547 S.W.2d 241, 243 (Tenn. 1977). In *Hodges v. S.C. Toof & Co.*, our Supreme Court instructed:

> a court may henceforth award punitive damages only if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly.
>
> A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

*Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992) (citations omitted). A plaintiff must prove that the defendant acted either intentionally, fraudulently, maliciously, or recklessly by clear and convincing evidence. *Id*. The *Hodges* Court also instructed that if the factfinder determines that punitive damages are appropriate, then:

> the factfinder shall consider, to the extent relevant, at least the following:
>
> (1) The defendant's financial affairs, financial condition, and net worth;
>
> (2) The nature and reprehensibility of defendant's wrongdoing, for example
>
>> (A) The impact of defendant's conduct on the plaintiff, or
>> (B) The relationship of defendant to plaintiff;
>
> (3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;
>
> (4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

(5) The expense plaintiff has borne in the attempt to recover the losses;

(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Id.*

In this case, the Trial Court discussed the *Hodges v. S.C. Toof & Co.* factors to be considered in awarding punitive damages and found that Defendant "made false representations regarding the use of the license, the sales volume of the business, the actual earnings of the business, as well as the value of the inventory that existed at the time of the transaction." The Trial Court further found that Defendant refused to acknowledge any wrongdoing, had come up with stories to explain his actions, had shown an "utter disregard for the licensing laws of this state and concocted a scheme that defrauded the plaintiff and made it at the very least illegal for the plaintiff to operate his business." The Trial Court also stated that Defendant's "misrepresentations have been punitive to a point that he has uttered falsehoods from this stand during the course of his testimony in an effort to further his scheme." We find no abuse of discretion in the award of punitive damages.

As to the amount of punitive damages, Plaintiff argues that unless the punitive damages are increased, he "will not be restored to the position he was in before the fraud occurred." While that may be true, we find Plaintiff's argument unpersuasive because the purpose of punitive damages is not to compensate a plaintiff but rather is to punish the wrongdoer and to deter others from engaging in similar conduct. *Metcalfe v. Waters*, 970 S.W.2d 448, 450-52 (Tenn. 1998). Therefore, we find no abuse of the Trial Court's discretion in the amount of punitive damages awarded.

**Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Peter Zaloum.

_____
D. MICHAEL SWINEY, JUDGE