# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
November 15, 2011 Session

## CONSULTING AND FINANCIAL SERVICES, INC., ET AL. V. JOHN H. FRIEDMANN, SR.

**Appeal from the Chancery Court for Sumner County**
**No. 2008C205     Tom E. Gray, Chancellor**

---

**No. M2011-00093-COA-R3-CV - Filed April 19, 2012**

---

This suit arises as a result of the installation of tile flooring in a home. Homeowners sued the contractor for breach of warranty, breach of contract, and unjust enrichment. The trial court awarded $106,103.92 to homeowners and assessed $4,252.00 in discretionary costs. Contractor appeals asserting that, in finding liability, the trial court failed to apply the standard of performance set forth in the contract and that the court erred in calculating and measuring the damages. We have determined that the trial court applied an implied warranty or workmanship rather than the contractual standard; however we have reviewed the evidence *de novo* and modify the judgment to hold that the contractor breached the contractual standard. We remand the case for a determination of the appropriate amount of damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Modified and Vacated in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

John R. Phillips, Jr. and Bruce N. Oldham, Gallatin, Tennessee, for the Appellant, John H. Friedmann, Sr.

Russell E. Edwards and Michael W. Edwards, Hendersonville, Tennessee, for the Appellee, Consulting and Financial Services, Inc. and Paul G. Crenshaw.

**OPINION**

**I. Facts and Procedural History**

On May 10, 2004, Consulting and Financial Services, Inc. ("CFS") contracted with John H. Friedmann, Sr., a licensed general contractor, to construct a home in the Fairvue Plantation subdivision in Gallatin, Tennessee. The "Building Contract" ("the contract") provided, among other things, as follows:

1. That the Contractor will construct in a good, workmanlike manner, and without delay, a dwelling or other specified building in accordance with the plan, drawings, and specifications attached to and made part of this Contract on the following described property. . . .

8. The Contractor shall correct any work that fails to conform with the requirements of the contract documents where such failure to conform appears during the progress of the work, and shall remedy any defects due to faulty materials, equipment or workmanship which shall appear within a period of one year from the date of the issuance of a Use and Occupancy Permit. The provision of this article apply [sic] to work done by subcontractors as well as work done by direct employees of the Contractor. Contractor warrants the fitness and habitability of the work, and compliance with all codes.

Paul G. Crenshaw, president of CFS, and Sherry Steffey, wife of Mr. Crenshaw and vice president of CFS, took possession of the residence on May 7, 2005. Approximately six months after moving into the home, Ms. Steffey noticed cracked tile in the kitchen. She notified Mr. Friedmann about the damaged tile; Mr. Friedmann came to inspect the tile, but he did not repair it. Subsequently, tile in the master bathroom, hallways, and foyer began to crack.

On August 8, 2008, CFS and Paul G. Crenshaw (collectively referred to as "Plaintiffs") filed suit against Mr. Friedmann. The complaint alleged that Mr. Friedmann "poorly and negligently constructed" the home, which constituted a "breach of warranty, breach of contract, and/or unjust enrichment." With respect to the allegations of breach of contract and breach of warranty, Plaintiffs specifically alleged that Mr. Friedmann "failed to construct this dwelling in a workmanlike manner, and thus, has breached the warranty and/or contract with CFS." Plaintiffs requested damages equaling the cost of repair, cost of inspections, and attorney's fees.

A bench trial commenced on July 14, 2010. Mr. Crenshaw and Ms. Steffey testified primarily regarding their plans for construction of the home, their concerns about the cracked tile, their interactions with Mr. Friedmann, and how the condition of the tile worsened over time. Three consultants, hired by Plaintiffs, testified regarding their inspections and their reports relative to the condition of the tile and the structural significance of the cracks. A real estate agent, an engineer, a licensed contractor, and tile installation specialist testified on behalf of Mr. Friedmann regarding the installation and replacement of the tile.

The trial court entered an Order on October 15, 2010, awarding judgment to Plaintiffs in the amount of $132,565.00; the court found that "the construction of the residence at 836 Plantation Way, Gallatin, Sumner County, Tennessee, by John H. Friedmann, Sr., failed to meet prevailing standards in the Sumner County Community for residential construction . . . ." In discussing the amount of the judgment, the court stated, in relevant part:

> Plaintiffs present evidence of cost to repair to be $159,790.00 and defendant has one tile installer who gives an estimate of $12,432.00 and another who makes a quote of $14,750.00. The low estimates are to remove existing tile and install new tile. To limit the damages to just tile work is not just. More problems exist for correction than just replace [sic] the tile flooring. The estimated scope of work shown on Exhibit 26 made to the testimony of Gene Hughes is realistic.
> The court awards a judgment in favor of plaintiff for $132,565.00 which is cost of material and labor for estimated work at $118,362.00 and profit at 12% of $14,203.00 ($118,362.00 plus $14,203.00 = $132.565 [sic]).

On November 3, 2010, the trial court entered an Order awarding $4,252.00 in discretionary costs to Plaintiffs.

On November 15, 2010, Mr. Friedmann filed a Motion to Alter or Amend requesting that the court alter the amount of the judgment by deducting the amount awarded for retiling the basement. The court granted the motion and reduced the judgment to $106,103.92. Mr. Friedmann appeals.

## II. Standard of Review

In a case heard without a jury, we review a trial court's findings of fact *de novo* with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Because the trial court is in the best position to observe witnesses and evaluate their demeanor, we afford great deference to a trial court's credibility determinations. *Hughes v. Metro. Govt. of Nashville and Davidson Cnty.*, 340 S.W.3d 352,

360 (Tenn. 2011). We review questions of law *de novo* with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

## III. Analysis

### A. Implied Warranty

Mr. Friedmann's first issue on appeal centers around his belief that, in finding liability in this case, the trial court employed the implied warranty of workmanship first enunciated in *Dixon v. Mountain City Const. Co.*, 632 S.W.2d 538 (Tenn. 1982), rather than the standard set forth in sections 1 and 8 of the contract between the parties.

The trial court did not cite any of the contractual provisions in its rulings, nor did it specifically make a finding as to whether Mr. Friedmann breached the contract by failing to construct the home in a "good workmanlike manner." The trial court simply stated that, "The court has considered the testimony of all witnesses and the court finds that the workmanship on construction of the residence at 836 Plantation Way, Gallatin, Tennessee 37066 fails to meet prevailing standard [sic] in the Sumner County Community for residential construction."

The implied warranty established by our Supreme Court in *Dixon*, only applies when the written contract is silent regarding the standard of performance. *Dixon v. Mountain City Const. Co.*, 632 S.W.2d 538, 541 (Tenn. 1982). The *Dixon* Court noted that, "[b]uilder-vendors and purchasers are free to contract in writing for a warranty upon different terms and conditions or to expressly disclaim any warranty." *Id.* at 542. In this case, the parties executed a contract requiring Mr. Friedmann to construct the dwelling in a "good, workmanlike manner" and to "remedy any defects due to faulty materials, equipment or workmanship which shall appear within a period of one year from the date of the issuance of a Use and Occupancy Permit." Because the parties agreed to a particular standard for the construction work and potential repairs, the implied warranty is not at issue in this case.

In a similar case, *Wilkes v. Shaw Enterprises*, we considered whether the trial court applied the appropriate standard in resolving a dispute over a residential construction. *Wilkes v. Shaw Enters., LLC*, No. M2006-01014-COA-R3-CV, 2008 WL 695882, at *8 (Tenn. Ct. App. March 14, 2008). In that case, the parties executed a contract requiring the builder to construct the home "in accordance with good building practices." *Id.* When ruling on the case, the chancellor, quoting from *Dixon*, applied the implied warranty of good workmanship and made no mention of the contractual standard of "good building practices." *Id.* at *8–9. Because the record was silent regarding "good building practices," we remanded the case for

a "seemingly obvious determination by an expert that the construction of the Wilkes' house did not comply with 'good building practices.'" *Id.* at *9.

Like the chancellor in *Wilkes*, the trial court here applied an implied warranty of workmanship rather than the one contracted for by the parties. However, unlike the record in *Wilkes*, our record does contain evidence of whether the defects in the house constitute a breach of the contractual standard, and we proceed to make a *de novo* determination in that regard.

### B. Breach of Contract

A plaintiff alleging breach of contract must prove "the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (citing *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). Mr. Friedmann does not dispute the existence of a written enforceable contract. Thus, we continue our analysis by considering whether there is evidence that Mr. Friedmann failed to install the tile in a good, workmanlike manner and whether he failed to repair any defects due to faulty workmanship as dictated by the contract.

Mark J. Smith, a licensed professional engineer and home inspector, testified that he made two inspections of the property; he prepared written reports of his observations, results, and recommendations which were entered into evidence. Mr. Smith's report indicated that on June 18, 2007, he conducted a "limited inspection" on the property to "observe conditions of concern regarding cracks in the tile floors . . . and to offer an opinion regarding the structural significance of those conditions." Following his inspection, he concluded that, "the floor preparation or stabilization was not properly completed." Mr. Smith conducted a second investigation on May 23, 2008, during which he examined the structural system of the home and gave an opinion about the condition of the building. In his report, Mr. Smith explained that he "removed basement ceiling tiles underneath areas where cracks were observed in the first floor tile" and discovered "[g]aps between the floor joists and the sub floor allow[ing] the sub floor to move. These gaps also allow the floor to settle or cause indentations in the tile as load is applied." With respect to his first inspection, Mr. Smith testified:

Q: What was the conclusion you reached about this cracking?

A: At that time, based on looking at the exterior or top surface of the tile, it looked like it had been improperly installed or that's what our conclusion was,

that these cracks may have lined up with the edges of a cement board or that there was a cement board installed, and that was the most likely cause of it.

Relative to his second inspection, Mr. Smith testified:

Q:   On this particular visit, on May 23rd, tell the Court what you found at that time.

A:   Well, we found that there were gaps between the tops of the floor joists and the sub floor. . . .  From the basement the ceiling acoustic tiles are removable so we could go and look at the floor joists.  And underneath, there's a wall in the basement directly underneath this area here.  I'm pointing underneath the right side of the kitchen island and up through the dining room. There's a wall in the basement and then a band joist or beam underneath that wall.  On either side or on both sides of that beam the floor joists were not in contact with the sub floor.  And so I actually have a photo showing construction there.  This photo actually shows the 2-by-12 floor joist as it meets up to that beam where that wall-supported band joist - - and see it's notched out because it's taller than the beam.  But there's a gap between - - in several areas there was a gap between the top of the floor joist and the bottom side of the sub floor.
. . .
You see I inserted a rod in here just to show that there's a gap there.  This gap is not just at the wire, but it runs maybe a foot and a half at least on each side of that girder

Q:   Let me ask you something.  As far as good workmanship, should you be able to put a wire in between the decking and the joist?

A:   No.  What happens is that because that gap is there, when someone steps on the floor in that location, it deflects to close the gap.  When you have deflection of the floor, you have cracking of the tile.  And that's why I think this cracking here occurred, because it's above where those gaps are.

Q:   And what do you do to make sure that there's no deflection?  What's good workmanship?

A:   Well, to glue and screw the floor down is one way, but first the framing is made so that the tops of the framing members are level with each other.

Q:   Did that happen here?

A:   No.

Similarly, Dale Collins, owner of A Closer Look Flooring and certified home inspector, testified that he found "gaps" between the subfloor and floor joists which caused the tile to crack. Regarding the contractual standard, he testified:

Q:   Now, taking the overall observation, examination that you made of this flooring, do you have an opinion as to whether this was good workmanship, workmanlike manner?

A:   It was poor workmanship, and if I might add, in standards also. . . .

The trial court specifically found in the Memorandum accompanying the order that the testimony of Mr. Smith and Mr. Collins was "credible." We afford this determination great deference.[1] *See Hughes*, 340 S.W.3d at 360 (citing *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997)) ("When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony.").

We have carefully reviewed the record and find that the testimony of Mr. Smith and Mr. Collins support a finding that Mr. Friedmann did not meet the contractual standard that the construction would be in a good, workmanlike manner, and that the construction defects amounted to a breach of the contract.

*C. Damages*

The purpose of assessing damages in a breach of contract action is to "place the plaintiff, as nearly as possible, in the same position he would have had if the contract had been performed." *Id.* (quoting *Wilhite v. Brownsville Concrete Co., Inc.*, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990)). A trial court's determination regarding the proper amount of damages is a question of fact. *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005) (citing *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998)). The question of whether the trial court utilized the proper measure of damages is a question of law that we review *de novo*. *Id.*

---

[1] The trial court also found that two witnesses who testified on behalf of Mr. Friedmann—Anthony Locke, a professional engineer, and Danny Guy, a licensed contractor—were not credible.

Mr. Friedmann asserts that the trial court erred in measuring and calculating the amount of damages awarded. Mr. Friedmann first contends that the trial court erred by applying the cost of repair as the standard for the measure of damages rather than the diminution in value of the property. Second, he argues that the award of damages included compensation for problems that were not brought to his attention during the one year period required under the contract. We will address each contention in turn.

### 1. Measure of Damages

Mr. Friedmann argues that, because there has been no reduction in the value of the Plaintiffs' property, they are not entitled to an award of damages. He also contends that the repair estimates are "inflated" and "grossly disproportionate to any reduction in value."

Tennessee courts have discussed two methods of measuring damages in actions for breach of a construction contract—cost of repair and diminution in value. *See Wilkes*, 2008 WL 695882, at *10. The distinction between the two measures has been summarized by our Court thusly:

> As a general rule, the measure of damages is the cost of correcting the defects or completing the omissions, rather than the difference in value between what ought to have been done in the performance of the contract and what has been done, where the correction or completion would not involve unreasonable destruction of the work done by the contractor and the cost thereof would not be grossly disproportionate to the results to be obtained. On the other hand, the courts generally adhere to the view that if a builder or contractor has not fully performed the terms of the construction agreement, but to repair the defects or omissions would require a substantial tearing down and rebuilding of the structure, the measure of damages is the difference in value between the work if it had been performed in accordance with the contract and that which was actually done, or (as it sometimes said) the difference between the value of the defective structure and that of the structure if properly completed.

*Id.* (quoting *Edenfield v. Woodlawn Manor, Inc.*, 462 S.W.2d 237, 241 (Tenn. Ct. App. 1970); *see also Mize v. Consulo*, M2011-00455-COA-R3CV, 2011 WL 6152980 (Tenn. Ct. App. Dec. 8, 2011). In sum, "[g]enerally, the measure of damages will be the cost [of] repair unless the repairs are not feasible or the cost is disproportionate to the [diminution] in value." *GSB Contractors*, 179 S.W.3d at 543 (quoting *Radant v. Earwood*, No. 02A01-9802-CV-00029, 1999 WL 418339, at *8 (Tenn. Ct. App. June 22, 1999)). Importantly, "[t]he burden is on the defendant to show that the cost of repairs is unreasonable when compared to the

diminution in value due to the defects and omissions." *Id.* (citing *Nutzell v. Godwin*, 1989 WL 76306, at *1 (Tenn. Ct. App. July 13, 1989)).

Thus, in order for the award of damages to be other than the cost of repair, it was incumbent upon Mr. Friedmann to offer proof showing diminution in value. *See Nutzell*, 1989 WL 76306, at *1–2 (affirming trial court's use of cost of repair measure where defendant failed to produce evidence of diminution in value). The only proof Mr. Friedmann offered in this regard was the testimony of Susan Maddox-Reed, a realtor hired by Plaintiffs, who testified that the home was originally listed for sale in June 2007 for $1,150,000.000, that the price was subsequently reduced to $924,000.00, and that she was unable to sell the home. We do not find Ms. Maddox-Reed's testimony to be probative evidence of diminution in value.

In determining the diminution in value, comment b to the Restatement (Second) of Contracts § 347 provides the following guidance:

> the loss in value caused by the breach is equal to the difference between the value that the performance would have had if there had been no breach and the value of such performance as was actually rendered. In principle, *this requires a determination of the values of those performances to the injured party himself and not their values to some hypothetical reasonable person or on some market.*

Restatement (Second) of Contracts § 347 cmt. b (emphasis added).[2] Ms. Maddox-Reed testified regarding the listing price of the property, but she did not give an appraisal or other competent evidence of value or diminution in value. Moreover, in ruling that the cost of repair was the most appropriate measure of damages, the trial court implicitly held that the cost of repair was not unreasonable. We find no error in the trial court's use of the cost of repair as the measure of damage in this case.

### 2. Amount of Damages

Having concluded that the trial court used the appropriate measure of damages, we now consider whether the trial court erred in the computation of damages. The court based its determination of damages on the estimate of Gene Hughes, a licensed general contractor

---

[2] In *Mize v. Consulo*, this Court acknowledged that our Supreme Court has previously cited, with approval, Section 347 of the Restatement (Second) of Contracts. *Mize v. Consulo*, No. M2011-00455-COA-R3-CV, 2011 WL 6152980, at *5 (Tenn. Ct. App. Dec. 8, 2011). *See BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 136 (Tenn. 2001).

who testified at trial and submitted a written estimate which was made an exhibit to his testimony. Mr. Friedmann first contends that the trial court erred in relying on the estimate of Mr. Hughes because his testimony regarding repair costs was "excessive" and "speculative." Mr. Friedmann also asserts that Mr. Hughes' estimate includes costs for repairs of items that were not identified by Plaintiffs within the one-year time frame outlined in the contract and that the trial court erred in awarding damage for such repairs. Specifically, it is Mr. Friedmann's contention that the trial court erroneously awarded damages for repair of the deck.

We first consider Mr. Friedmann's argument that Mr. Hughes' testimony was speculative and excessive. The trial court stated the following regarding the written estimate and testimony of Gene Hughes:

> Gene Hughes testified that he has been a home builder for thirty five (35) years in the company of Hughes-Edwards Homes. From Exhibit 26 the court finds the first paragraph leads to a conclusion that the workmanship at 836 Plantation Way did not meet the workmanship standards prevailing in the community. For repairs Mr. Hughes estimated costs to repair to be $159,790.00. His costs of repair reflected a 35% profit margin and thorough work on all aspects of repair. . . .
>
> . . . The estimated scope of work shown on Exhibit 26 made to the testimony of Gene Hughes is realistic.

We find nothing in the record to preponderate against the trial court's finding that Mr. Hughes' estimate is "realistic" and "thorough." Moreover, the trial court did not accept Mr. Hughes' estimate wholesale; rather, the court made modifications to the amount of damages awarded by omitting damages for repair to the basement of the home[3] and changing the profit margin to 12%. We find no error in the trial court's acceptance of Mr. Hughes' estimate rather than the estimates proffered by Mr. Friedmann

Mr. Friedmann also contends that Plaintiffs did not notify him of some items included in the award of damages within the time frame outlined in the contract, and that, consequently, the award for those items was not available under the contract.

---

[3] Mr. Hughes' estimate also includes costs of repair for the basement, and the trial court included cost of repairing the basement in its original order; however, the trial court eliminated damages awarded for basement repairs in ruling on the motion to alter or amend.

The trial court awarded damages in accordance with the repair estimate of Mr. Hughes.[4]  We have reviewed Mr. Hughes' estimate and note that the estimate includes repair costs for problems with the decking, contrary to paragraph 8 of the contract.  For example, Mr. Hughes lists the "Estimated scope of work" to include: removal of tile on both back porches, removal of material under the tile, building up slope on porch floors, applying water proofing mat on porch floors, and installing new tile on porch floors.  The portion of the estimate detailing the monetary amount for repair does not delineate which line items relate to problems with the deck.

There is undisputed evidence that Plaintiffs notified Mr. Friedmann regarding the cracked tile within one year of their occupancy of the home.  However, there was no evidence indicating that either Mr. Crenshaw or Ms. Steffey noticed any issue with the deck within the one-year time frame outlined in the contract.  In *Bunch v. Cooper*, buyers and sellers of a newly constructed home entered into a contract that disclaimed "all other warranties" and expressly warranted the materials and workmanship of the construction for one year.  *Bunch v. Cooper*, No.03A01-9705-CV-00154, 1997 WL 600150 (Tenn. Ct. App. Sept. 30, 1997). Buyers discovered water problems with their home more than one year after moving in and sued sellers for recovery of damages.  We held that the buyers could not avoid the one-year express warranty and were therefore unable to recover for the problems occurring outside of the one-year time frame.  *Id.* at *3.  Likewise, we find that Plaintiffs in this case should be limited to recovery for the cost of repairs they identified and complained of within the one-year period outlined in the contract.  Therefore, we must vacate the judgment and remand the

---

[4]  The itemized estimate provides as follows:

| Crenshaw estimate: | Cost |
| --- | --- |
| Move furniture | 1200 [sic] |
| R&R tile 1st floor | 56,616 |
| 2nd floor | 15874 [sic] |
| Lumber | 4,000 |
| Carpenter | 14,000 |
| Electrical | 850 |
| Move cabinet base | 1,000 |
| Granite | 4200 [sic] |
| Trim Material & Labor | 2250 [sic] |
| Paint | 1200 [sic] |
| Protective Material | 250 |
| Dumpster | 400 |
| Misc. | 5000 [sic] |
| Rough clean up | 3000 [sic] |
| Final Clean up | 850 |

case for the trial court to determine the amount of damages not including repair work on the deck.

### D.  Other Matters

Throughout their brief, Plaintiffs assert that Mr. Friedmann should be barred from raising certain arguments on appeal that he did not raise in his Motion to Alter or Amend.  We disagree.  As we have previously opined, "where there is both a final judgment as well as an order on a motion to alter or amend (or other post-judgment motion recognized in Tenn. R. Civ. P. 59), issues raised in either or both orders may be considered regardless of which may be designated in a timely notice of appeal." *Thompson v. Logan*, M2005-02379-COA-R3CV, 2007 WL 2405130, at *16 (Tenn. Ct. App. Aug. 23, 2007).  The issues raised by Mr. Friedmann arise from the final judgment and the motion to alter or amend, and are properly before this court.

Finally, we consider whether the trial court erred in granting a judgment to both CFS and Paul G. Crenshaw individually.[5]  Mr. Friedmann asserts that "[i]n the absence of any proof showing that Mr. Crenshaw had any standing as an individual to bring this lawsuit, the action should be dismissed as to Paul G. Crenshaw."  Mr. Friedmann fails to cite any authority to support his contention.  As we have previously recognized, "Failure to cite authority for propositions in arguments submitted on appeal constitutes waiver of the issue." *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 474 (Tenn. Ct. App. 2003).  Thus Mr. Friedmann's argument is waived.

## IV.  Conclusion

For the aforementioned reasons, we modify the judgment to hold that Mr. Friedmann breached the contract with Plaintiffs; we vacate the award of damages and remand the case for a redetermination of damages in accordance with this opinion.

_____
RICHARD H. DINKINS, JUDGE

---

[5] Paul Crenshaw signed the contract on behalf of CFS, not in his individual capacity.

-12-