IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 11, 2015 Session

**BAKERS CONSTRUCTION SERVICES, INC. v.
GREENEVILLE-GREENE COUNTY AIRPORT AUTHORITY**

**Appeal from the Chancery Court for Greene County
No. 20110352     Hon. Douglas T. Jenkins, Chancellor**

**No. E2014-01395-COA-R3-CV-FILED-MAY 14, 2015**

This is a breach of contract action concerning a construction project.  The plaintiff argued that the defendant's failure to provide access to the job site hampered its ability to complete the project in an efficient manner.  The defendant responded that the plaintiff waived the failure to provide access to the site and that the plaintiff was the first to breach the contract by failing to provide a construction schedule.  Following a bench trial, the court ruled in favor of the plaintiff.  The defendant appeals.  We affirm the decision of the trial court as modified to reflect an adjustment in the award of discretionary costs.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed as Modfied; Case Remanded**

JOHN. W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

Ronald W. Woods, Jeffrey M. Ward, and Brandy M. Burnette, Greeneville, Tennessee, for the appellant, Greeneville-Greene County Airport Authority.

Reggie E. Keaton, Knoxville, Tennessee, and C. Thomas Davenport, Jr., Bristol, Tennessee, for the appellee, Baker's Construction Services, Inc.

**OPINION**

**I.     Background**

On September 4, 2009, Baker's Construction Services ("Plaintiff") entered into a $2,039,811.60 contract with Greeneville-Greene County Airport Authority ("Defendant") to provide grading, excavation, embankment, utilities, and drainage work necessary to extend the runway and taxiway of the Greeneville-Greene County Airport.  The extension

was intended to correct a line of site deficiency on the runway. The project was federally funded through the American Recovery and Reinvestment Act ("ARRA") and administered through the Tennessee Aeronautics Division of the Tennessee Department of Transportation ("TDOT"). Barge Waggoner Sumner Cannon, Inc. ("BWSC") served as the design engineer firm for the project.

The job site was surrounded by private property. Defendant was tasked with securing the properties and providing rights-of-way for the area where the work was to be performed. Prior to signing the contract, Plaintiff was informed that some of the properties had not been secured. Four days later, Defendant issued a notice to proceed, requiring Plaintiff to commence operations the following day, September 9, 2009. Plaintiff was tasked with completing the project within 260 days. While Plaintiff commenced operations on the project, the contract was revised several times to correct clerical errors. The final contract was not received by Plaintiff until October 21, 2009.

On October 26, 2009, Plaintiff submitted a notice of claim asserting that Defendant's failure to provide access to the job site impeded the work of excavation and embankment. Thereafter, Plaintiff continually requested access to the job site and repeatedly informed Defendant of problems caused by the lack of access. Despite the repeated requests, Plaintiff did not obtain full access to the job site until September 24, 2010.

On December 6, 2011, Plaintiff filed suit against Defendant, alleging breach of contract because Defendant impeded Plaintiff's efforts by failing to provide access to the job site.[1] Plaintiff argued that its inability to utilize the site caused disruption and delay damages; additional costs; general administrative expenses; and other damages. Plaintiff requested damages in excess of $2,351,000, prejudgment interest, and discretionary costs. Defendant requested dismissal of the complaint, asserting that it informed Plaintiff prior to the execution of the contract that the rights-of-way had not been acquired but that work needed to commence by a certain date in order to secure funding. Defendant asserted that Plaintiff had waived any claim for breach of contract by proceeding with the work with the knowledge that the rights-of-way were not secured.

The case proceeded to a bench trial. Bart Allen Devore, who served as the vice president and project manager for Plaintiff during the time period in question, stated that Plaintiff was responsible for clearing and grading the site before the paving of the runway could be completed in the second phase of the project. Prior to signing the contract at issue, he attended a pre-construction meeting on September 3, 2009.

---

[1] BCS also alleged that the Airport Authority breached the contract by failing to remit payment for the entirety of the work performed. The parties settled this portion of the claim.

A tape of the pre-construction meeting was played for the court. Mr. Devore; Chad Baker, Plaintiff's President; Ed McHugh, who worked for BWSC; Rick Hudgens, a TDOT employee; Janet Malone, Chairman of the Airport Authority; and others not pertinent to this appeal were present at the meeting. During the meeting, Mr. McHugh asked if they should discuss the property acquisition issues. Rick Hudgens replied, "Let's hold off on that." Later in the meeting, Mr. Devore was informed that there was property along the existing taxiway that had not been acquired. Mr. Hudgens proclaimed that Defendant was "pretty close" to getting the right of entry if they had not already closed on the property. Ms. Malone stated that Defendant had not closed on any of the properties. Mr. Devore opined that "developing the schedule was really critical" in order to understand which fill areas were needed. Ms. Malone later expressed concern regarding a piece of property at the end of the runway, namely the Solomon Property. She related that the occupants would need access to the property, thereby impeding Defendant's ability to close the nearby road for construction purposes. Mr. Baker expressed concern regarding the fact that they would have to "hopscotch[] around" the job site because some of the properties had not been acquired.

After Mr. Devore and Mr. Baker left the meeting, Mr. Hudgens stated,

All right. This property thing, it pissed me off to the point of I'm tired of messing with – it's ridiculous. We have got – we have got some property out here that we know today we could go to the property owner and say this is what it's worth. This is what we are going to give to you, and we ain't got s**t.

The remaining parties, Ms. Malone, Mr. McHugh, Mr. Hudgens, and others not pertinent to this appeal, then discussed the extensive problems related to acquiring the properties.

Mr. Devore testified that he was not apprised of the extent of the problems related to acquiring the properties prior to signing the contract. He identified a provision in the contract that provided as follows:

[Defendant] will be responsible for furnishing all rights-of-way upon which the work is to be constructed in advance of [Plaintiff's] operations.

He claimed that Defendant failed to provide the rights-of-ways as provided in the contract. He identified several properties that were not available prior to the issuance of the notice to proceed. He related that the project was dependent upon a sequence of moving material back and forth in an effort to dry the soil before filling certain areas in compliance with the airport's modified compaction requirements. He opined that they

needed to place 50 percent of the fill material in an area that was unavailable and that they could have utilized rock material from another piece of unavailable property.

Mr. Devore testified that he submitted a request for information, dated September 19, 2009, that provided as follows:

> The construction traffic control sign plans for Old Wilson Road cannot be installed per bid plans due to acquisition of property. We have discussed the need to close off this road to all but local traffic as we will need to cross Old Wilson Road to access stockpile area and obtain the "more suitable" soil from across Old Wilson Road for embankments and haul the "less suitable" soil to stockpile location. We plan to start cul-de-sac and turn around construction as soon as possible. The construction signage plans call for Old Wilson road to be closed to thru traffic with barricades placed across the roadway.
>
> We request a revised plan due to liability reasons should we deviate from the approved plans and construction signage plan. Please see attached existing plans and forward a revised plan for this work on Old Wilson Road due to property acquisition issues.[2]

He explained that it was extremely important to access the soil across the road because of the moisture content levels. They needed the use of the dryer soil to maintain production and progress. He stated that they were required to cross the road through an access gate because they were unable to completely close the road. Use of the access gate was inefficient because only one unit could pass through the gate at a time, causing delay as the unit traveling in the opposite direction was left to wait its turn.

Mr. Devore identified the notice of claim, dated October 26, 2009, which provided, in pertinent part, as follows:

> [Plaintiff] is hereby giving notice in accordance with [the contract] that the work of excavation and embankment is being severely impeded and the project cannot be constructed as bid because [Defendant's] property acquisition issues have limited jobsite area available to [Plaintiff] for the performance of its work. [Plaintiff's] cost and the time required to perform earthwork operations is being increased by lack of access to the entire project site for [Plaintiff] to best utilize cut and fill areas to maximize excavation efficiency. The inability to place embankment in the project

---

[2] Ms. Malone later testified that the road at issue was actually Old Wilson Hill Road.

area between station 45+00 and station 61+00+/- restricts the volume of project embankment that can be placed by approximately 50%. The existing soil moisture content makes the amount of available area for embankment placement that much more critical to [Plaintiff's] ability to control the cost to perform this work. Another area of the project unavailable for work is excavation area station 86+50 to 92+00+/- right, where our exploration uncovered rock that needs to be utilized in the lower fill areas.

The time frame for these areas to be available to work is unknown as of this date. At this time [Plaintiff] cannot quantify the total impact of this ongoing impediment on its Work but hereby submits notice as required under the Contract that a claim for adjustment will be submitted for additional compensation and for an extension to the Contract Time when the total impact can be ascertained.

He explained that they only had limited areas available to manipulate fill soil back and forth and that access to more area as anticipated during the bidding process would have increased their ability to dry soil and continue placing fill material.

Mr. Devore testified that he attended a progress meeting with Defendant and that he documented the minutes of the meeting in an email that provided, in pertinent part, as follows:

[Plaintiff] asked about the liability of blasting as close as possible to the yellow house as it will be purchased by [Defendant] in the future. Blasting to the limit would generate additional fill for rock fill areas that is the only feasible fill on-site that can be accomplished with the wet conditions. The answer was [Plaintiff] is totally liable until property is purchased by airport. This property will be taken by condemnation after the holidays.

[Plaintiff] inquired as to the status of remaining property purchase by airport. Status is property acquisition is in progress and offers have been made to property Owners. No firm date as of this meeting for property to be turned over to construction.

* * *

The status of Cemetery relocation was discussed, no firm date for relocation.

* * *

> The demolition of yellow house was determined to be an extra to the contract. This parcel was noted in bid process that it would be gone before construction started.
>
> [P]laintiff asked about demo of Old Wilson Road pavement. The roadway must stay for access to yellow house and other two properties on existing road or stone placed if asphalt removed. Airport is to notify residents of pending road closure next week.

He explained that Plaintiff planned to work through the winter by acquiring as much rock as possible because the rock could be placed when the weather was too damp to place the soil. He related that they were unable to work through the winter, in part, because they did not have access to the job site. He opined that the work could have "been close" to completion if they had worked through the winter. He conceded that his bid schedule reflected a shutdown during the winter months due to weather.

Mr. Devore identified a letter that he sent to Defendant in April 2010, inquiring whether the property issues had been resolved and advising Defendant that the work would be more costly as a result of the property issues. He reminded Defendant of his initial letter in October 2009 and requested a response within 10 days of receipt of the letter. He never received a response from Defendant.

Mr. Devore conceded that he only submitted one construction schedule throughout the course of the project, despite the fact that the contract required him to provide construction schedules on a bi-monthly basis. He testified that he informed Defendant by email in May 2010 that he was unable to provide a construction schedule because they did not have access to the entire job site. He stated that he advised Defendant that he would craft a schedule once he knew when the site would be available. He was informed that negotiations for acquisition of the property were ongoing and that acquisition had been delayed because Defendant had not secured grants to purchase the properties. He testified that at the time of contracting, Defendant did not explain that it needed to secure grants to purchase the properties. He advised Defendant that the loss of access to just one of the properties, the Solomon Property, cost approximately $7,000 per day.

Mr. Devore testified that they resumed work on June 28, 2010, despite the fact that they still did not have access to the job site. At that time, they had utilized 87 of the 260 planned working days. He testified that Plaintiff incurred remobilization costs to fence an area that was previously unavailable at the start of the project and that they were

unable to drill and blast to secure rock material because the Solomon Property was unsecured. He conceded that the airport project had generated a profit by June 30, 2010.

Mr. Devore notified Defendant once again in July 2010 that Plaintiff was hindered in its ability to perform efficiently due to the unavailability of the job site. He explained that they were unable to utilize the warm weather in the summer months because the site remained unsecured. He stated that his request to increase efficiency regarding the closure of Old Wilson Hill Road was denied. He agreed that some properties were available as the work progressed and that he was provided access to other properties even though they were not officially acquired. He also agreed that he could have refused to sign the notice to proceed because Defendant could not provide access to the job site.

Plaintiff secured access to the entirety of the job site in September 2010; however, Mr. Devore claimed that issues regarding the job site remained because they had to haul materials in a less efficient manner. They also experienced additional costs because they were unable to finish before Phase II of the project began. He believed that they would have finished prior to the start of Phase II if the properties had been available as anticipated in the bid documents. He conceded that he was aware from the beginning of the project that Phase II was set to begin in Spring 2010.

Mr. Devore stated that they suspended work once again in December 2010 due to weather conditions. They resumed work in May 2011, and 20 working days were added to the contracting period. He related that the project was substantially completed by July 1, 2011, within 334 working days. He asserted that they remained on the project to perform maintenance issues and erosion control until November 2011.

Earl Buchanan, the Chief Financial Officer for Plaintiff, testified that the total cost for the airport project was $4,251,166.14.

Kevin Buck, Plaintiff's estimator, senior project manager, and corporate secretary, testified that he toured the property before preparing the estimates. He stated that Ms. Malone informed him on the tour that the Solomon Property would be acquired before the start of the project. He explained that he prepared the estimate with the understanding that the job site, including the Solomon Property, would be available to Plaintiff. He asserted that the project was not the same without access to the property. He explained,

> It's a pretty simply project. The biggest elements are the excavation and fill elements and items. And to do efficient grading, particularly on material as on this project where you have got the geotechnical report indicated that you have got fairly moist material, and it gets more moist as you go down deeper. And we do that – additional explorations for our own

benefit to confirm that that was the case before we started. But that – the method to mediate the problem of moisture is area.

When you are performing your cuts, you are starting at the top and, of course, the top is just a small area, and the cut gets bigger as you go down. You are increasing the area of the cut. But as you are going down into the more moist material, you have got a larger area which is exposed to the weather which hopefully is drying weather, so you have got weather to dry it. If necessary, you can also put – you can use mechanical drying, disks. We use disk tractors like farmers use, although bigger ones.

The fill area is the same way. You start your fills at the bottom. You have got a small fill area to work in, and then you are bringing that up. As you come up, the fill area gets bigger, so you have got more area for drying.

Also, you are worried about hauling material the shortest distance possible. You want to take the closest cut to the . . . farthest fill. In other words, you need to move the material as quickly and short a distance as possible over the whole project.

He asserted that the bid documents assumed that Plaintiff would move the "farthest fills first with the best materials." He explained that the cost of moving the material changed as the distance changed.

Mr. Buck stated that Plaintiff was required to obtain bid security with a bonding company obligating Plaintiff to follow through with the agreement or forfeit a percentage of the contract award. Likewise, Plaintiff was required to provide a performance bond and a payment bond, providing that all payments made by the contractor were necessary. He stated that Plaintiff's financial statements that reflected a profit were inaccurate because the statements considered direct cost, not general administrative cost and were driven by an estimated profit.

Mr. Baker testified that he served as the president for Plaintiff. He confirmed that they needed large areas of property in order to effectively complete the project by moving from area to area while waiting for the soil in each area to dry. He asserted that the project exceeded the estimated cost because they were unable to place the fill material the way they anticipated in the bid documents. He likewise confirmed that forfeiting the bid, performance, or payment bond would have been detrimental to himself and the company. He explained that grading contractors cannot "jump around from bonding company to bonding company" because contractors need to build long-term relationships with the bonding company in order to secure the ability to obtain future bonds for future projects.

He agreed that the performance and payment bonds were not executed until September 4, 2009, after the pre-construction meeting. He conceded that he was present for the pre-construction meeting, where he learned that the properties had not been acquired. He asserted that he believed Ms. Malone when she claimed that she would close on the properties quickly. He agreed that he did not provide a construction schedule as requested. He explained that they could not produce a schedule until they knew which properties would be available to them.

William Frank Connole, president of Franvel Corporation, estimated that Plaintiff was entitled to in excess of $2,300,000 in damages. He calculated the damages sustained by Plaintiff, in part, by using the measured mile method, which "compares productivity in a period unaffected by the contract change with the productivity attained while encountering the change." Mr. Connole claimed that the lack of access impacted each period of the project; therefore, he chose the period with the least disruption to production as the measured mile. He identified that period as September 9, 2009, to September 25, 2009 ("Period 1"), despite the fact that Plaintiff only worked four days during Period 1 and that most experts disregard the first period and the last period when attempting to choose the least impacted period. He explained that the loss of efficiency in production was determined by comparing the hourly production in Period 1 against the hourly production during other periods, yielding a loss of efficiency factor percentage for each period. He noted that the production for Period 1 was 117.6 cubic yards per hour, while the production for Period 2 was 39.5 cubic yards per hour, yielding a loss of efficiency factor of 66.41 percent. He then identified a percentage for each period.

Mr. Connole calculated the disruption costs due to lack of access by multiplying the period operating costs by the loss of efficiency percentage for each period, yielding a disruption cost of $1,320,460. Recognizing that BWSC had credited Plaintiff for some of the additional cost, he reduced the cost by $49,603, yielding a final disruption cost of $1,270,857.

Mr. Connole testified that the loss of access also caused increased equipment cost due to underutilization. He stated that rental contracts assume 176 working hours per month for each piece of equipment. He reduced the total operating hours for each month by 176 to ascertain the number of standby hours for each piece of equipment. He stated that after reviewing the weather conditions, he believed that Plaintiff should have been able to resume work after the winter shutdown from April through July 2010; therefore, he calculated 176 standby hours per month for each piece of equipment during that time period. He then multiplied the total standby hours for each piece of equipment by the standby rate recognized in the industry, yielding a total delay cost of $295,908.

Mr. Connole testified that Plaintiff incurred an additional cost of $580 to ensure that blasting operations were not detrimental to the Solomon Property. Likewise, the fencing subcontractor was required to return to the site to fence property that was previously unavailable due to loss of access; therefore, Plaintiff incurred a remobilization cost of $1,800. He related that Plaintiff incurred an extended field overhead cost of $50,765 because the project was not finished within the anticipated completion date. He stated that Plaintiff also incurred additional general administration expenses of $403,175 and an additional $60,000 to complete the project. Finally, he added a profit of $208,308.50, bond damages of $45,785, and a gross receipt tax of $2,351. He conceded that Plaintiff originally estimated a profit of 4.8 percent, not 10 percent.

Mr. Connole also calculated the damages sustained by Plaintiff using the total cost method, which reflects the total cost minus the payments received plus additional expenses. Using that method, he estimated that Plaintiff sustained $2,616,780 in damages. He agreed that the measured mile method was more indicative of the actual damages sustained by Plaintiff.

Following the trial court's denial of Defendant's motion for a directed verdict, Ed Crook, a real estate appraiser and right-of-way acquisition consultant, testified that he assisted Defendant in obtaining the rights-of-way for the airport project. He recalled that he assisted in the negotiations, relocation assistance, and the property closings for 16 properties that were affected by the airport project. He began work in March 2009, when the property appraisals were not yet complete. He explained that TDOT reviewed the appraisals before he was able to negotiate and make any offers. He related that each property was subject to condemnation if he could not come to an agreement with the owner. He recalled that there were 4 or 5 properties out of the 16 that required displacement of the property owners. He stated that once he was able to reach an agreement, he still had to secure funding from the State of Tennessee to close the properties. He acknowledged that he informed Ms. Malone of the problems in securing the properties but that he never spoke with Plaintiff.

Ed McHugh testified that he was the project manager for BWSC for the airport project. He recalled that BWSC conducted a preliminary study in 2008 to correct the line of sight deficiency. BWSC was employed as the design engineer for the project when the request for funding was approved. BWSC produced designs for a site preparation package and a pavement package. He stated that the entire project had to be completed within approximately two years. The project also had to be ready for construction with an accepted bid by September 2009. He stated that the project involved a

> site preparation package which was relocating some fence lines, grading at
> the end of the 23 side of the runway to extend that out about 1600 feet with

[a] 1000-foot safety area. The excess material would have been stockpiled on the north side of the site for future use for the next several phases.

He recalled that Plaintiff was awarded a unit price contract for the site preparation portion of the project. He explained that Plaintiff was compensated based upon the quantity of materials moved, provided, or installed. He stated that he was surprised at the bids submitted for the project because he anticipated a price of $5 per cubic yard, instead of the approximate $2 per cubic yard requested by Plaintiff, yielding a $1,200,000 difference.

Mr. McHugh stated that BWSC had a good working relationship with Plaintiff and that he believed that Plaintiff produced "good quality work." He recalled that any issues with the project were addressed through change directives or schedules during progress meetings. He recalled that the soil was "very moist" and required additional work to achieve the proper moisture content to meet compaction requirements. He claimed that the weather was disruptive to the grading and excavation work and that after the winter shutdown, Plaintiff did not request to resume work on the project until May 2010. He believed that it would have been difficult for Plaintiff to work prior to that time due to the weather conditions. He asserted that periods of shutdown were anticipated for this project, just like any project affected by weather conditions. He claimed that Plaintiff was aware that Phase II of the project was set to begin before Phase I was completed.

Mr. McHugh testified that the contract required Plaintiff to produce construction schedules on a regular basis and that he asked for a construction schedule "[s]everal times." He only received one schedule. Plaintiff advised him that a schedule could not be produced until Plaintiff knew when the properties would be available. He advised Plaintiff that a schedule was necessary to gauge the impact of the limited job site and to know which properties were hindering production. He recalled that Plaintiff was present at the pre-construction meeting and knew that the properties had not been secured. He claimed that Plaintiff could have refused to sign the contract and that prior to October 2009, Plaintiff never informed him that they could not complete the project as bid. Plaintiff never sought to modify the contract, and he never received any estimates or assessments regarding the increased cost. He related that Plaintiff's request for damages was twice the compensation anticipated in the contract award.

Mr. McHugh conceded that the properties were not available to Plaintiff as everyone had originally anticipated. He identified an email in which he stated, in pertinent part,

Janet, I think we should phrase the letter to say that the Airport Authority was granted right of access for the properties owned by SMN and that these

properties combined with the property owned by the Airport were the properties where work was performed in 2009. The next part should say[,] Prior to beginning construction in 2010, I will provide you with another letter identifying areas that are available for construction that have been obtained by the Airport Authority.

Let's not say anything about acquiring since the end of construction in 2009. That is putting in writing the fact that we did not have control of all the properties.

He agreed that the meeting notes for the pre-bid meeting did not contain any references to the issues in acquiring the properties at the job site. He acknowledged that Plaintiff continually asked about the properties and requested access to the job site. He conceded that the contract was not performed within the original contract period but asserted that the work was completed within the acceptable time limits required to secure the funding.

Janet Malone testified concerning the particulars for the funding of the project. In pertinent part, she stated that the project could not receive federal funding if they did not break ground by September 16, 2009. Relative to the properties, she said that Defendant had worked to get the properties appraised years before they even received funding for the project. She related that they never had any indication that there would be a problem in acquiring the properties. She recalled that they did not realize they had an issue with the Solomon Property until November 2009 and that they eventually had to acquire that property through condemnation. She acknowledged that she received an email, dated July 16, 2009, from Mr. McHugh that provided as follows:

Based on our phone call yesterday, Rick asked that I prepare a priority list for the appraisal reviews that we need handled first. I have attached a drawing for the parcels and a listing that I have prioritized. We are looking to start construction in August and I will need all of these soon. The ones that will impact construction starting are shown as the first 6 on the list. They are also in order of preference/urgency. Tract 8/8A, Solomon tract has a residence that we will have to relocate the owners so this is number 1. The other five (48, 50, 10, 18, & 19) are needed to start earthwork.

She agreed that some of the properties that were identified as a priority were some of the last properties acquired by Defendant.

Ms. Malone testified that she never purposefully withheld information from Plaintiff and that she never advised Plaintiff that they would have the properties by a certain date. She related that the grant to acquire the properties was not even approved

until May 2010. She agreed that she may have advised Plaintiff that she did not foresee any problems in acquiring certain properties, specifically the Solomon Property. She asserted that Plaintiff never indicated that the project could not start until the properties were acquired or asked how long until they would acquire the properties. She opined that she would not have insisted on their compliance or solicited funds pursuant to the bond agreements if Plaintiff had refused to comply with the notice to proceed. She claimed that Plaintiff did not inform her that the project could not be completed as bid until October 2009. She related that she did not know how serious the claim was because they never provided her with specifics regarding the cost as a result of loss of access to the site. She asserted that despite repeated requests, she did not receive a schedule from Plaintiff until June 2010. She claimed that it was difficult to know which properties were most important to Plaintiff without a schedule. She stated that she informed Plaintiff when each property was available to them as part of the job site. She agreed that Plaintiff's work was hindered by the unavailability of the properties.

Robert Guthrie, II testified that he and his team at Construction Project Solutions reviewed the claim submitted by Plaintiff and Mr. Connole's report. He opined that he did not believe that Defendant had breached the contract because construction projects routinely require relocation of site utilities. He believed that Defendant was not required to provide the rights-of-way for each property at the beginning of the project but that Defendant was required to provide the rights-of-way for each property when Plaintiff began work in that particular area. He related that in order for Defendant to timely provide access to each property, Plaintiff was required to submit a construction schedule outlining which properties were needed as the project progressed.

Mr. Guthrie stated that Plaintiff assumed the risk that the project would exceed the costs estimated in its bid. He related that some companies submitted lower bids for the project, while others submitted higher bids for the project. He stated that there were even some bids within the $4,000,000 range anticipated by Defendant when it began the bidding process. He asserted that the damages claimed by Plaintiff were simply unreasonable. He admitted that Plaintiff's losses were a result of the inability to move the material at the rate they anticipated in the bid documents. He conceded that most of his experience was in reviewing manufacturing claims, not excavation and grading claims. He agreed that he had not visited the project site in this case.

Relative to the damages sustained by Plaintiff, Mr. Guthrie asserted that Plaintiff was not entitled to damages during the winter shutdown. He explained that the parties agreed that work on the project should stop due to weather and the ongoing property issues. He asserted that Plaintiff was also not entitled to damages related to any delays experienced as a result of Phase II of the project. He opined that it was Plaintiff's responsibility to coordinate with the other contractors on the project and ensure that the

schedules did not conflict. He likewise asserted that the scope of Plaintiff's work did not change as a result of the property issues. He agreed that the order in which Plaintiff performed the work changed but asserted that it was "not uncommon for design phases to change" during construction. He stated that Plaintiff should have recognized at the pre-construction meeting that the unavailability of the properties affected the construction schedule. He asserted that Plaintiff should have addressed the issue with Defendant and made any necessary adjustments to the contract price or the schedule before complying with the notice to proceed. He related that Plaintiff's October 2009 notice should have included an indication of the additional cost and that the parties should have discussed the potential impacts to the cost as the project progressed. He opined that the parties could have researched and negotiated the cost of the impact during the winter shutdown instead of simply ignoring the issue and proceeding with the work after a six-month delay.

Mr. Guthrie testified that the measured mile method was the preferred method for calculating damages. He disagreed with Mr. Connole's use of Period 1 as the measured mile when Plaintiff only worked for four days during that period. He asserted that Period 8, August 25 through September 18, 2010, was the least impacted period. He explained that during Period 8, Plaintiff had access to more of the job site and was utilizing more pieces of equipment. He likewise disagreed with Mr. Connole's use of actual cost in calculating damages. He asserted that the use of the unit price anticipated in the contract was more indicative of the actual damages sustained by Plaintiff. Using Period 8 as the measured mile, he calculated the disruption cost due to lack of access by multiplying the amount billed by Plaintiff based upon the unit price in the contract by the loss of efficiency percentage for each period, yielding a total of $151,785.82 in disruption damages. He agreed that Plaintiff was entitled to $580 for blast monitoring and $1800 for remobilizing the fencing subcontractor.

Mr. Guthrie testified that Plaintiff was not entitled to delay damages because Plaintiff did not provide adequate documentation to justify that the equipment was underutilized. He explained that equipment is routinely underutilized throughout construction projects. He also disagreed with Mr. Connole's use of blue book rates for equipment costs and the calculation of delay damages from April through June 2010. He explained that the parties agreed to the length of the winter shutdown. In the event that the court held that delay damages were necessary, he calculated the damages using the rates published by the United States Army Corps of Engineers and excluding damages during the winter shutdown. He estimated that Plaintiff's claim for delay damages should be reduced to $79,029.37. He did not believe that Plaintiff was entitled to additional damages for extended field overhead, general administration expenses, profit, bond, or a gross receipts tax because the contract unit price included these additional expenses claimed by Plaintiff. He agreed that recovery of field overhead and general

administration expenses would be appropriate if Plaintiff were able to claim that Defendant extended the contract period.

Following the presentation of the above evidence, the trial court held that Defendant breached the contract with Plaintiff and that Plaintiff was entitled to damages following the expiration of an initial 60-day period, in recognition of Plaintiff's knowledge that the properties were not available. The court requested additional reports from each expert regarding the calculation of damages. After reviewing the reports, the court found that the measured mile method, with Period 1 as the measured mile, was the appropriate method for calculating damages. However, the court agreed with Defendant that the amount of damages should be calculated using amount billed by Plaintiff based upon the unit price in the contract, not the actual cost claimed by Plaintiff. The court awarded damages in the amount of $550,547.50, representing $369,871.66 in disruption damages, $28,295.84 in delay damages, $580 for additional blast monitoring, $1,800 for the remobilization of the fencing subcontractor, and $150,000 in additional expenses for extended field overhead and general administration expenses. Thereafter, the court awarded Plaintiff an addition $158,854.27 in prejudgment interest and $9,989.70 in discretionary costs. This timely appeal followed.

## II.    ISSUES

We consolidate and restate the issues raised on appeal as follows:

A.      Whether the trial court erred in finding that Defendant breached its contract with Plaintiff.

B.      Whether the trial court erred in calculating the disruption damages awarded to Plaintiff.

C.      Whether the trial court erred in awarding prejudgment interest.

D.      Whether the trial court erred in awarding discretionary costs.

## III.    STANDARD OF REVIEW

After a bench trial, we review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). Because the trial court is in the best position to observe witnesses and evaluate their demeanor, we afford great deference to a trial court's credibility determinations. *Hughes v. Metro. Govt. of Nashville and Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). We review questions

of law de novo with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006).

The trial court's award of prejudgment interest is reviewed under an abuse of discretion standard. *BankcorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006); *Franklin Capital Assocs., L.P. v. Almost Family, Inc.*, 194 S.W.3d 392, 405 (Tenn. Ct. App. 2005). Likewise, discretionary costs are awarded pursuant to Rule 54.04(2) of the Tennessee Rules of Civil Procedure expressly address themselves to the sound discretion of the trial court. *Stalworth v. Grummins*, 36 S.W.3d 832, 835 (Tenn. Ct. App. 2000). "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App.1999).

## IV.   DISCUSSION

### A.

In order to prevail in a breach of contract case, a plaintiff must prove "the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (citing *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). The cardinal rule of contract interpretation is that the court must attempt to ascertain and give effect to the intention of the parties. *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). In attempting to ascertain the intent of the parties, the court must examine the language of the contract, giving each word its usual, natural, and ordinary meaning. *See Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996). The court's initial task in construing the contract is to determine whether the language is ambiguous. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). In general terms, an ambiguity occurs where a word or phrase is capable of more than one meaning when viewed in the context of the entire agreement by an objective and reasonable person. *Campora v. Ford*, 1124 S.W.3d 624, 629 (Tenn. Ct. App. 2003) (citing *Walk-in Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987)). If the language of a contract is ambiguous, the ambiguity must be construed against the drafter of the contract. *See Hanover Ins. Co. v. Haney*, 425 S.W.2d 590, 592 (Tenn. 1968); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 598 (Tenn. Ct. App. 1999).

Defendant argues that it did not breach its contract with Plaintiff because it provided the rights-of-way prior to Plaintiff's work on each piece of property. Plaintiff responds that Defendant was required to provide the rights-of-way for the entirety of the job site before Plaintiff commenced operations. The provision at issue in this case provide as follows:

> The Owner will be responsible for furnishing all rights-of-way upon which the work is to be constructed in advance of the Contractor's operations.

Defendant's suggested interpretation, namely that it was required to provide the right-of-way to each piece of property before Plaintiff commenced operations on that piece of property, is a strained interpretation of the contract and does not give each word its usual, natural, and ordinary meaning when viewed in the context of the entire agreement. Indeed, the contract defines "work" as follows:

> The furnishing of all labor, materials, tools, equipment, and incidentals necessary or convenient to the Contractor's performance of all duties and obligations imposed by the contract, plans, and specifications.

We, like the trial court, believe that the provision at issue clearly and unambiguously provided that Defendant was required to provide the rights-of-way to the entire job site prior to the start of Plaintiff's operations.

Defendant asserts that if it was required to provide the rights-of-way prior to the start of operations, Plaintiff waived that requirement by commencing operations, despite the property issues. Defendant claims that the trial court erroneously refused to find that Plaintiff waived the provision at issue, despite awarding damages following the expiration of an initial waiver period. Plaintiff responds that it never waived Defendant's responsibility to provide access to the job site as evidenced by the repeated requests to secure access to the job site.

Following the presentation of the evidence at trial, the court recognized that Plaintiff was not entitled to damages if it waived the provision at issue in the contract; however, the court advised the parties that it was considering applying a "partial waiver" to the facts of the case. Upon consideration of case law submitted by the parties, the court retracted its earlier statement and specifically found that Plaintiff had not waived any provisions of the contract. The court then assessed damages, following the expiration of an initial 60-day period. Citing *Henley Supply Co., v. Universal Contractor, Inc.*, No. 88-238-II, 1989 WL 31620, *4 (Tenn. Ct. App. Apr. 7, 1989), Defendant asserts that assessing damages following a waiver period is contrary to law.

In *Henley*, this court stated,

> Inaction in situations where a person would normally be expected to act can be conduct amounting to a waiver. Thus, courts will usually conclude that persons who, with knowledge of the other party's breach, continue to perform or to accept the benefits of the contract without making a timely objection have waived their right to insist on strict performance.

> Once a party has waived a contractual right, it cannot later revoke its waiver at its own convenience and insist on strict performance.

1989 WL 31620, at *4 (internal citations omitted). However, this court has also stated,

> A waiver is an intentional relinquishment of a known right. Waiver is a doctrine of very broad and general application. It concedes a right, but assumes a voluntary relinquishment of it. Our courts have held that there must be clear, unequivocal and decisive acts of the party or an act which shows determination not to have the benefit intended in order to constitute a waiver.

*Gitter v. Tennessee Farmers Mut. Ins. Co.*, 450 S.W.2d 780, 784 (Tenn. Ct. App. 1969) (internal citations omitted); *see also Regions Bank v. Thomas*, 422 S.W.3d 550, 561 (Tenn. Ct. App. 2013) (citing *Gitter* with approval and discussing the doctrine of waiver).

Here, Plaintiff was not aware of the extensive problems in procuring the rights-of-way and was not even informed that Defendant had not procured the grants to purchase the properties. The record also reflects that Defendant purposefully withheld information from Plaintiff and intentionally avoided providing Plaintiff with documentation concerning the extent of the issue. When Plaintiff realized the extent of the problem, it promptly advised Defendant that it was incurring damages and requested access to the properties pursuant to the contract. With these considerations in mind, we conclude that Plaintiff did not waive the provision requiring Defendant to provide the rights-of-way to the entire job site prior to commencing operations. We agree that a court may not award damages to a party after determining that the party waived the contractual provision at issue. However, the trial court is tasked with assessing damages in an amount it deems fair and reasonable. *See generally BancorpSouth Bank, Inc.*, 223 S.W.3d at 230 (citations omitted). With these considerations in mind, we conclude that the trial court did not err in assessing damages following the expiration of an initial 60-day period.

This conclusion does not end our inquiry because Defendant alternatively argues that if it breached the contract and Plaintiff did not waive the breach, then Plaintiff was

the first to breach the contract by failing to provide construction schedules. Plaintiff responds that its failure to provide schedules was a result of Defendant's failure to provide access to the job site. The provisions at issue provide as follows:

> **80-03 PROSECUTION AND PROGRESS.** Unless otherwise specified, the Contractor shall submit his/her progress schedule for the Engineer's approval 10 days prior to the pre-construction meeting. The Contractor's progress schedule, when approved by the Engineer, may be used to establish major construction operations and to check on the progress of the work. The Contractor shall provide sufficient materials, equipment, and labor to guarantee the completion of the project in accordance with the plans and specifications within the time set forth in the proposal. . . .

> * * *

> **100-04 PROJECT PROGRESS SCHEDULE.** The Contractor shall submit a coordinated construction schedule for all work activities. The schedule shall be prepared as a network diagram in Critical Path Method (CPM), PERT, or other format, or as otherwise specified in the contract. As a minimum, it shall provide information on the sequence of work activities, milestone dates, and activity duration.

> The Contractor shall maintain the work schedule and provide an update and analysis of the progress schedule on a twice monthly basis, or as otherwise specified in the contract. Submission of the work schedule shall not relieve the Contractor of overall responsibility for scheduling, sequencing, and coordinating all work to comply with the requirements of the contract.

These provisions are clear and unambiguous when viewed in the context of the entire agreement. Plaintiff provided a schedule during the bidding process but did not provide subsequent schedules on a "twice monthly basis."

"In cases where both parties have not fully performed their contractual obligations, it is necessary for the court to determine which party is chargeable with the first uncured material breach." *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990). "Only [Plaintiff's] uncured material failure to perform its own contractual obligations would have excused [Defendant] from performing its remaining obligations." *Id.* (citation omitted). In determining whether a failure to perform is material, courts consider the following circumstances:

(a)     the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b)     the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c)     the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d)     the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e)     the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.* (citation omitted).   Here, Plaintiff claimed that it could not submit a construction schedule, other than the one submitted during the bidding process, without knowing when the site would be available for its operations, while Defendant claimed that it needed a schedule to determine which properties were necessary for Plaintiff's operations.  Having concluded that Defendant was contractually required to provide access to the entire job site at the start of the project, we further conclude that Plaintiff's failure to provide construction schedules pursuant to the contract was not a material breach of the contract given Plaintiff's repeated assurances that it would provide a schedule when possible. Accordingly, Defendant's failure to provide the rights-of-ways prior to the start of the project was the first material breach of the contract.

B.

Plaintiff argues that the trial court erred in adopting Mr. Guthrie's assessment of disruption damages.  Mr. Guthrie calculated the disruption damages by multiplying the amount billed by Plaintiff based upon the unit price in the contract by the loss of efficiency percentage for each period, while Mr. Connole calculated the disruption damages by multiplying the period operating costs by the loss of efficiency percentage for each period.  Plaintiff claims that assessing damages according to the amount billed based upon the unit price ignores the actual cost incurred.  Defendant responds that the trial court did not err in adopting Mr. Guthrie's assessment because the actual cost incurred by Plaintiff included the inefficiencies as a result of the loss of access.

"The purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have had if the contract had

been performed." *Wilhite v. Brownsville Concrete Co.*, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990). A trial court's determination regarding the proper amount of damages is a question of fact. *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005) (citing *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998)). "'However, the choice of the proper measure of damages is a question of law to be decided by the court.'" *BankcorpSouth Bank*, 223 S.W.3d at 228 (quoting *Beaty v.. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998)). "While the amount of damages to be awarded in a given case is not controlled by fixed rules of law or mathematical formulas, [ ] the evidence upon which a party relies to prove damages must be sufficiently certain to enable the trier of fact, using its discretion, to make a fair and reasonable assessment of damages[.]" *Id.* at 230. "'The law does not require exactness of computation in suits that involve a question of damages growing out of contract or tort.'" *Id.* (quoting *St. John v. Bratton*, 150 S.W.2d 727, 729 (Tenn. Ct. App. 1941)). Relative to construction contracts, this court has found,

> In the context of a construction project . . . we find that it is reasonably foreseeable that a contractor whose ability to complete its work is impaired by the owner and whose performance is thereby substantially delayed will suffer direct damages and that the extent of these damages will depend upon the unique facts of each case. These damages can include, among other things, increased payroll and other labor costs, increased material costs, costs resulting from the loss of efficiency of the use of equipment, increased costs for extended bonding and insurance coverage, and other increased overhead items that can reasonably be attributed to the performance of the work that was delayed.

*Moore Constr. Co. v. Clarksville Dept. of Elec.*, 707 S.W.2d 1, 15 (Tenn. Ct. App. 1985).

The trial court in this case chose the measured mile method as the appropriate measure of damages and awarded disruption damages in the amount of $369,871.66, thereby rejecting Mr. Connole's final computation of disruption damages in the amount of $1,087,502. In support of its position, Plaintiff cited two Pennsylvania cases, which are not binding upon this court. Moreover, adopting Mr. Connole's computation of disruption damages would have resulted in a total award of $1,268,204.84, a sum the court was clearly unwilling to award as evidenced by its statements following the trial. The court stated,

> And in looking at these damages, the Court intends to cut them down there to what the Court things is reasonable. . . .

You know, just – I just don't think it's right to say the project doubled in cost to the Airport. And, you know, one thing that they say that I do strongly agree with is you bid a bunch of projects. If you just accidentally underbid it, I can't do anything about that. That's just part of doing business.

While the court utilized the measured mile method in assessing disruption damages, it was not limited to either expert's computation of damages. We uphold the court's award of damages as a fair and reasonable assessment of the damages sustained by Plaintiff as a result of Defendant's breach.

## C.

Defendant argues that the trial court erred in awarding prejudgment interest when the amount of the award was not reasonably ascertainable or reasonable given the excessive amount of damages sought by Plaintiff. Plaintiff responds that the trial court did not err in awarding prejudgment interest at the rate of 10 percent.

The trial court may award prejudgment interest "as an element of, or in the nature of, damages . . . in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." Tenn. Code Ann. § 47-14-123. "The usual means of compensating for [loss of use of funds] is the allowance of interest. Interest recovered in order to make the obligee whole is the relief usually sought, and the allowance of prejudgment interest under such circumstances is 'familiar and almost commonplace.'" *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994) (quoting *Deas v. Deas*, 774 S.W.2d 167, 170 (Tenn. 1989)). "The purpose of [prejudgment] interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Hunter v. Ura*, 163 S.W.3d 686, 706 (Tenn. 2005) (quoting *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)).

In determining whether to award prejudgment interest, courts should consider the principles of equity and two additional factors. *Mitchell*, 876 S.W.2d at 830. First, an award of interest is allowed when "the amount of the obligation is certain" or reasonably ascertainable "by a proper accounting" and "is not disputed on reasonable grounds." *Myint*, 970 S.W.2d at 927. Second, an award of interest is allowed when "the existence of the obligation itself is not disputed on reasonable grounds." *Id.* However, "[t]he uncertainty of either the existence or amount of an obligation does not mandate a denial of prejudgment interest, and a trial court's grant of such interest is not automatically an abuse of discretion, provided the decision was otherwise equitable." *Id.* at 928.

Here, the amount of the obligation was reasonably ascertainable through the use of the measured mile method, and the award of interest was equitable because Plaintiff lost the use of the funds while the case progressed in extensive litigation. Moreover, the court's decision to award prejudgment interest at a statutory rate of 10 percent was wholly within the court's discretion. Tenn. Code Ann. § 47-14-123. Following our review, we conclude that the trial court did not abuse its discretion in awarding prejudgment interest at the rate of 10 percent.

D.

Defendant asserts that the trial court erred in awarding discretionary costs to Plaintiff. Plaintiff responds that the court did not err. In awarding discretionary costs, the court stated as follows:

> . . . with discretionary costs being awarded in the sum of $1,920.00 for the plaintiff's expert's attendance at trial, in the sum of $1,800.00 for one-half of the plaintiff's expert's time for traveling to and from the trial, in the sum of $400 for the plaintiff's expert's time for calculating damages to supplement his testimony pursuant to the request of the Chancellor, in the sum of $600 for the charges of the defendant's expert for giving a deposition, and in the sum of $5,989.70 for the court reporter's invoices after subtracting for mileage and document scanning, for a total award of discretionary costs in the sum of $9,989.79.

A "prevailing party" may request discretionary costs pursuant to Rule 54.02(2) of the Tennessee Rules of Civil Procedure, which provides, in pertinent part,

> Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees not paid pursuant to Tennessee Supreme Court Rule 42, and guardian ad litem fees; travel expenses are not allowable discretionary costs.

The purpose of awarding discretionary costs is to help "make the prevailing party whole," not to punish the losing party. *Owens v. Owens*, 241 S.W.3d 478, 496-97 (Tenn. Ct. App. 2007). When deciding whether to award discretionary costs under Rule 54.04(2), the trial court should:

1) determine whether the party requesting the costs is the "prevailing party,"

2) limit awards to the costs specifically identified in the rule,

3) determine whether the requested costs are necessary and reasonable, and

4) determine whether the prevailing party has engaged in conduct during the litigation that warrants depriving it of the discretionary costs to which it might otherwise be entitled.

*Mass. Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 35–36 (Tenn. Ct. App. 2002) (citations omitted). The burden is on the movant to convince the trial court that it is entitled to discretionary costs. *Carpenter v. Klepper*, 205 S.W.3d 474, 490 (Tenn. Ct. App. 2006); however, as a general matter, courts should "award discretionary costs to a prevailing party if the costs are reasonable and necessary and if the prevailing party has filed a timely and properly supported motion." *Jefferson*, 104 S.W.3d at 35.

Rule 54.02(2) specifically excludes travel expenses, whether for mileage or time spent traveling. *See generally Magness v. Couser*, No. M2006-00872-COA-R3-CV, 2008 WL 204116, at *11 (Tenn. Ct. App. Jan. 24, 2008). These charges were not properly awarded as discretionary costs. In recognition of the court's discretion in such matters, we affirm the remainder of the award. The judgment of the trial court should be modified to reflect the appropriate adjustment in the award of discretionary costs.

## V.    CONCLUSION

The judgment of the trial court is affirmed as modified, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Greeneville-Greene County Airport Authority.

_____
JOHN W. McCLARTY, JUDGE